612 A.2d 604

**ALLEGHENY LUDLUM CORPORATION, Petitioner,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**ARMCO ADVANCED MATERIALS CORPORATION and Air Products and Chemicals, Inc., Petitioners,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 9, 1991.

Decided June 25, 1992.

108

Daniel P. Delaney, for petitioner, Allegheny Ludlum Corp.

Michael L. Kurtz, for petitioner, Armco Advanced Materials Corp. and Air Products and Chemicals, Inc.

John A. Levin and Billie E. Ramsey, Asst. Counsels, for respondent.

Tanya J. McCloskey, Asst. Consumer Advocate, for intervenor, Office of Consumer Advocate.

Michael D. McDowell and Alan P. Buchmann, for intervenor, West Penn Power Co.

Edmund J. Berger, Asst. Consumer Advocate, for intervenor, Irwin A. Popowsky, Consumer Advocate of Pennsylvania.

Before CRAIG, President Judge, and DOYLE, COLINS, PALLADINO, McGINLEY, SMITH and PELLEGRINI, JJ.

McGINLEY, Judge.

These are consolidated petitions for review by industrial ratepayers from an order of the Pennsylvania Public Utility Commission (PUC or Commission) in a general base rate case in which West Penn Power Company (West Penn or the utility) applied for an increase in rates.[1] On March 15, 1990, West Penn filed supplements to existing tariffs, which were calculated to produce approximately $56,880,000 in additional annual revenues, an increase of approximately 7.9%. Complaints against the proposed supplements were filed by the Office of Consumer Advocate (OCA), the Office of Small

[1]. West Penn also filed a petition for review, at No. 125 C.D.1991, challenging the Commission's determination of the cost of common equity capital in the calculation of rate of return. In *West Penn Power Co. v. Pennsylvania Public Utility Commission,* 147 Pa.Commonwealth Ct. 6, 607 A.2d 1132 (1992), this court affirmed the PUC's order as to the determination of the cost of common equity.

Business Advocate, Armco Advanced Materials Corporation and Air Products and Chemicals, Inc. (together, Armco), Allegheny Ludlum Corporation (Allegheny Ludlum), West Penn Power Industrial Users Group and others. Milesburg Energy, Inc. (Milesburg) and another party were granted intervenor status. The Commission suspended the operation of the supplements and ordered a formal investigation into their justness and reasonableness, with participation of the Office of Trial Staff of the PUC (OTS). Administrative Law Judge Larry Gesoff (ALJ) conducted multiple evidentiary hearings and a public input hearing.

The ALJ issued a Recommended Decision on October 15, 1990, which included a recommendation that West Penn had established a need for additional annual revenues of $28,429,000. The principal parties filed exceptions and replies to exceptions. The Commission entered its opinion and order on December 14, 1990, authorizing an increase in operating revenues of $36,170,000. *Pennsylvania Public Utility Commission v. West Penn Power Co.,* 119 PUR 4th 110 (1990) (Commission Decision). The scope of our review of a decision of the PUC is to determine whether constitutional rights have been violated or an error of law committed and whether the PUC's findings are supported by substantial evidence in the record. 2 Pa.C.S. § 704; *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 561, 493 A.2d 653 (1985).

Some background is necessary for an understanding of the issues raised by Armco and Allegheny Ludlum and their conceptual and procedural relation to orders of the Commission in other proceedings. Electric utilities must offer to purchase power from cogenerators and small power producers that are "qualifying facilities" (QFs), under Sections 201 and 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. §§ 796(17)–(22) and 824a–3. The Federal Energy Regulatory Commission (FERC) regulations implementing Section 210 of PURPA require a rate for mandated purchases equal to (but not greater than) the full "avoided costs" (FAC). 18 C.F.R. § 292.304(b)(2). Those are defined as "the incremental costs to the electric utility of energy or

capacity *or both* which, but for the purchase from the qualifying facility ... such utility would generate itself or purchase from another source." 18 C.F.R. § 292.106(b)(6) (emphasis added).[2]

In Pennsylvania charges are recovered from customers through base rates and through the mechanism of the Energy Cost Rate (ECR).[3] In base rates, charges typically are allocated among various classes of customers in a rate structure. The primary consideration in establishing a rate structure is the cost of service, although this court has recognized that other concerns are properly considered as well.[4] Cost of

2. FERC explained in the preamble to the publication of this rule that *energy* costs are the variable costs associated with the production of electric energy—the cost of fuel and some other operating and maintenance expenses. *Capacity* costs are those associated with providing the capability to deliver energy—primarily the capital costs of facilities. FERC concluded: "If a qualifying facility offers energy of sufficient reliability and with sufficient legally enforceable guarantees of deliverability to permit the purchasing electric utility to avoid the need to construct a generating unit, to build a smaller, less expensive plant, or to reduce firm power purchases from another utility, the rates for such a purchase will be based on avoided capacity and energy costs. *Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978,* Docket No. RM79–55 (*1980 Rulemaking*), 45 Fed.Reg. 12214, 12216 (February 25, 1980). The PUC adopted regulations similar to the FERC regulations at 52 Pa.Code §§ 57.31 through 57.39; 12 Pa.B. 4237 (December 11, 1982).

3. The Commission established the ECR pursuant to Section 1307 of the Public Utility Code (Code), 66 Pa.C.S. § 1307, relating to sliding scale of rates; adjustments. The Supreme Court has stated, "The purpose of the ECR is to provide an automatic mechanism enabling utilities to recover specific energy costs not covered by general rates." *Allegheny Ludlum Steel Corp. v. Pennsylvania Public Utility Commission,* 501 Pa. 71, 75 n. 3, 459 A.2d 1218, 1220 n. 3 (1983). The ECR procedures include a required annual submission of a report of charges collected under the ECR and expenses incurred, followed by a hearing to reconcile the amounts and to determine any refunds owed or additional recovery due. Section 1307(f), 66 Pa.C.S. § 1307(f).

4. Customer classifications and attendant rate differences may be justified by a variety of considerations including the quantity of electricity used, the nature of the use, the pattern of the use or differences in conditions of service or cost of service, and by factors such as recent and past rate history, sales characteristics of the classes of consumers, practicability of administering the schedules, value of the service, promotional aspects of rates and competition by other fuels. *Peoples*

service is determined by consideration of cost-of-service studies, in which costs are first "functionalized" among categories of generation, transmission and distribution, and then classified within each function as demand/capacity costs, commodity/energy costs or customer costs (expenses, such as meters and billing, affected by the number of customers served). *See Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 122 Pa.Commonwealth Ct. 445, 552 A.2d 1135 (1989); J. Cawley and N. Kennard, Rate Case Handbook, A Guide to Utility Ratemaking before the Pennsylvania Public Utility Commission (Pennsylvania Public Utility Commission 1983) (Cawley and Kennard) at 257–61.

As a general rule, the capacity or "demand" component of the cost of service is lower for customers that have a high load factor, that is, the demand that they place on the system on a regular basis is close to their peak demand. The utility need not plan for or construct or purchase capacity to meet a peak demand far above the average consumption of such customers, which typically include large industrials. Customers with a low load factor consume electricity in a manner that varies widely, and their maximum peak demand is far above their average demand. Because the utility must comply with its statutory duty to secure sufficient capacity to meet its overall peak demand, the capacity component of the cost to serve such customers is higher, resulting in a higher overall rate for such a class. Cawley and Kennard at 258–59, 267.

■ Charges that are recovered through the ECR are assessed on strictly an *energy* basis: each customer is charged the same rate for every kilowatt hour (kwh) of electricity that it consumes, regardless of its load factor or any other considerations relating to cost of service. Since 1985, the Commission has approved recovery of costs from utility purchases of power from QFs on a dollar-for-dollar basis through the ECR. *AES Beaver Valley, Inc. v. West Penn Power Co.*, Docket No. C–844022 (entered March 13, 1985). In addition to normal fuel and energy costs, some demand-related items not involv-

*Natural Gas Co. v. Pennsylvania Public Utility Commission*, 47 Pa.Commonwealth Ct. 512, 532, 537, 409 A.2d 446, 455–56, 458 (1979).

ing QF purchases are recovered or credited through the ECR as well, i.e., purchases from non-QF sources and revenues from off-system sales of power.

In 1987 West Penn petitioned the PUC to approve the terms of a contract that it had negotiated with Milesburg for the delivery of power for thirty years from a QF that Milesburg was to construct. Armco and Allegheny Ludlum jointly challenged the procedure under which the PUC gave its approval. This court held that the Commission's approval of a utility-QF contract *that provides for significant payments for capacity* in a petition proceeding is an adjudication involving substantial property interests of ratepayers and so is subject to due process requirements of notice and an opportunity to be heard. *Barasch v. Pennsylvania Public Utility Commission,* 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296, *reargument denied,* 119 Pa.Commonwealth Ct. 115, 550 A.2d 257 (1988), *petition for allowance of appeal denied,* 523 Pa. 652, 567 A.2d 655 (1989) (*Milesburg I* ).[5] We remanded the case for further proceedings.

In the remand proceeding the Commission consolidated West Penn's Milesburg petition with those relating to three other QFs seeking to enter into contracts with the utility. In ruling on the exceptions filed to the recommended decision in that case, the Commission stated: "If QFs begin to represent a more significant portion of a utility's installed capacity, continued recovery of capacity charges on an energy basis through a fuel clause mechanism would incorporate a bias against high load factor customers (usually energy intensive industrial customers)." *Petition of West Penn Power Re: Milesburg Energy, Inc.,* Docket No. P–870216 (entered September 29, 1989) (*Milesburg Remand* ) at 44; Reproduced

5. Where a *capacity* payment is appropriate under the FERC regulations, the capacity of the QF substitutes for the capacity of the utility; the situation is similar to that where a utility constructs its own capacity. Where a utility purchases only *energy* from a QF, there is no monetary effect on ratepayers—they do not have an interest in the particular source of energy purchased at a price (FAC) equal to what the utility would have paid regardless. *See Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission,* 128 Pa.Commonwealth Ct. 276, 563 A.2d 557 (1989).

Record (R.R.) 638a.[6] Although the Commission stated that QF capacity costs currently being recovered through the ECR are not "substantial," each of the separate orders granting the petitions filed by West Penn included the following: "That capacity costs paid pursuant to the [West Penn–QF contract] will be recovered through the ECR on a demand/energy basis, the particular methodology for which will be established in a separate proceeding that will be initiated after receipt of an advisory report from the Commission's Bureau of Audits." *Id.* at 70; Brief of Petitioners Armco and Air Products, Appendix C.[7]

On June 15, 1990, after considering advice from the Bureau of Audits, the PUC entered another order, stating that the PUC regarded the question of the proper method of recovery of QF capacity payments—whether through base rates or the ECR—to be complex, and one that should be addressed in an on-the-record proceeding. The Commission ordered ALJ Gesoff, who was then conducting the West Penn base rate proceeding, to include an additional determination and "to address the issue of base rate v. ECR recovery of QF capacity costs," and "to recommend a particular ECR allocation methodology to be utilized should the Commission determine that

6. No payments are currently being made to the QFs involved in the *Milesburg Remand* (total capacity 205 megawatts (mw)), because they are not yet built, and payments are not due until they deliver power. However, QF capacity payments by West Penn to QFs currently producing power (total capacity 135 mw) for the period April 1, 1990, through March 31, 1991, were $31,764,279. Armco and Allegheny Ludlum Statement No. 1 at 14; R.R. 729a. The total capacity costs for West Penn's own generating units is approximately $130 million; thus the current QF capacity charges represent close to 20% of West Penn's overall capacity costs.

7. Armco and Allegheny Ludlum petitioned for review of the PUC's choice of the starting point from which FAC is calculated, and West Penn petitioned for review of the PUC's ordering it to enter into a new contract after the expiration of a contract deadline resulted in termination of the original contract. Those matters were resolved in this court's decision in *Armco Advanced Materials Corp. v. Pennsylvania Public Utility Commission*, 135 Pa.Commonwealth Ct. 15, 579 A.2d 1337 (1990) (*Milesburg II*), petitions for allowance of appeal granted, 529 Pa. 624, 627, 629, 600 A.2d 539, 542, 543 (1991). However, no party sought review of the portion of the Commission's orders providing for demand/energy recovery of capacity payments to these QFs.

ECR recovery of QF capacity costs should be continued."
*Pennsylvania Public Utility Commission v. West Penn Power Co.*, Docket Nos. R–901609 *et seq.* (entered June 15, 1990) at 3; R.R. 642a. Hence the presentation of evidence on this issue before the ALJ.

In his Recommended Decision the ALJ concluded that the provisions of PURPA as well as basic cost-of-service principles required allocation of QF capacity costs. He stated that the allocation should be handled in the ECR rather than base rates to avoid problems of over- or under-recovery of costs and potential contract disputes between West Penn and the QFs. He recommended use of the same demand allocation methodology as was accepted for determination of base rates (Peak and Average), and he recommended allocation through four rate classes, to limit the administrative burden involved. The classes were to be established in base rate proceedings (rather than litigated in each ECR reconciliation), and each was to have its own annual ECR reconciliation.

The Commission, in the decision now before us for review, paraphrased at great length from the positions of the parties provided by the ALJ, and it quoted in full the ALJ's discussion and resolution of this issue. The Commission summarized the positions of the parties on exceptions and reply exceptions. The Commission then resolved this issue as follows:

> On review of this issue, we have determined to make no change in our present policy of collection of QF capacity costs in the ECR.

> Strong reasons for not implementing the ALJ recommendation have been raised by the parties, not the least of which is the fact that QF capacity costs are only a portion of the capacity costs moving through West Penn's ECR.

> However, this issue is more fundamental than has been discussed by the parties. The purchase of QF power by West Penn and other Pennsylvania electric utilities, pursuant to our regulations, is production performance based. If the unit doesn't produce power, no payments are made. All the risks of the transaction are on the independent source.

This is distinctively different from the fixed recognition of utility based investments whose cost collection is independent of performance level for the most part. If QF payments were of a more fixed nature, such as dollars per kw per year, which may evolve as bidding programs develop, then base rate treatment may be appropriate.[8]

Accordingly, we have decided at this time not to complicate the ECR process through capacity disaggregation. Therefore, the exceptions of the parties are granted or denied, accordingly.

Commission Decision, 119 PUR 4th at 194.

Armco and Allegheny Ludlum raise a variety of challenges to the substance of the Commission's decision and to the manner in which it was rendered. The thrust of the substantive complaint is that the PUC, by declining to provide a demand allocation of QF capacity costs, has approved rates that are excessive as to some classes and inadequate as to others, thereby requiring their class to subsidize other classes, in claimed violation of federal and state law.

*Recovery of QF Capacity Charges under PURPA*

Section 210(b) of PURPA, 16 U.S.C. § 824a-3(b), relating to rates for purchases by electric utilities from QFs, embodies the avoided cost pricing rule. It provides that rules to be established by FERC shall provide for rates for such purchases that "shall be just and reasonable to the electric consumers of the electric utility and in the public interest," shall not discriminate against QFs and shall not "provide for a rate which exceeds the incremental cost to the electric utility of

8. In 1988 FERC issued a Notice of Proposed Rulemaking, *Regulations Governing Bidding Programs*, Docket No. RM88–5–000, proposing a new Part 293 to 18 C.F.R., which would authorize states to conduct bidding programs to establish rates for QF purchases, as a means of addressing the complexity and difficulties that had been encountered in determining FAC under the Part 292 regulations. The proposed regulations were never adopted. Some states have implemented bidding procedures on their own, and some states, including Pennsylvania, are considering them, but to date no such procedure has been adopted in Pennsylvania. *See* S. Ferrey, Law of Independent Power, (Clark Boardman 1990) Chapter 9.

alternative electric energy." [9] The Conference Report on the bill that became PURPA elaborates on the first quoted phrase as follows: "The conferees intend that the phrase 'just and reasonable to the electric consumers of the utility' be interpreted in a manner which looks to protecting the interests of the electric consumer in receiving electric energy at equitable rates." H.R.Conf.Rep. No. 1750, 95th Cong., 2d Sess. 97 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7797, 7831.

Both Armco and Allegheny quote from the Preamble to the *1980 Rulemaking,* 45 Fed.Reg. 12214, 12217–18:

[FERC] interprets its mandate under section 210(a) to prescribe 'such rules as it determines necessary to encourage cogeneration and small power production * * *' to mean that the total costs to the utility *and the rates to its other customers* shall not be greater than they would have been had the utility not made the purchase from the qualifying facility or qualifying facilities. (Emphasis added.)

Both also quote from the FERC decision *In re: Middle South Services, Inc.,* 33 F.E.R.C. (CCH) ¶ 61,408; 71 PUR 4th 580, 594 (1985): "The principle underlying [FERC's] avoided cost rule is that purchasing utilities and their customers be in the same or very similar position to what they would have been in if the qualifying facility output had not been purchased."

In its Reply Brief, Armco quotes from a FERC Notice of Proposed Rulemaking, *Administrative Determination of Avoided Costs, Rates for Sales of Power to Qualifying Facilities, and Interconnection Facilities,* Docket No. RM88–6–00; IV F.E.R.C. Statutes and Regulations (CCH) ¶ 32,457 (1988):

Under Section 210 of PURPA an electric utility's ratepayers are intended to be at least indifferent, in terms of the rates they pay as to the source of power. In other words, *the ratepayer is not to pay any more for power because the utility has purchased power from a QF rather than generating the power itself or purchasing the power from another wholesale source.* This is the principle underlying the

---

**9.** The corresponding regulation, 18 C.F.R. § 292.304(a), is essentially identical.

incremental cost ceiling on the rates utilities have to offer to QFs. (Emphasis added.)

The PUC and OCA contend that the statute and the regulations govern in very general terms. They assert that Section 210(b) and 18 C.F.R. § 292.304 are concerned only with the overall price paid by a utility for QF power, which the provisions limit to FAC, but that those provisions do not purport to control the manner in which utilities recover QF-related costs from ratepayers.

▪ If Section 210(b) is concerned only with the overall rates paid by a utility to a QF, then the phrase "just and reasonable to the electric consumer of the electric utility" is surplusage, because the subsection goes on expressly to limit the rates for purchases from QFs to the incremental cost of alternative electric energy, that is, to FAC. The legislative history and FERC's interpretations of its own regulations indicate that, although Section 210 of PURPA and the regulations do not require that a particular ratepayer be in precisely an identical position after a QF purchase as before, they definitely incorporate the concept of individual ratepayer indifference and protection from any inequitable effects resulting from the implementation of a mandated purchase of power from a QF, regardless of whether the overall price paid is at or below FAC. To the extent that a rate resulting from a purchase from a QF works substantial inequitable treatment on a particular ratepayer, it violates Section 210 of PURPA.[10]

10. Armco also argues that Sections 111(d) and 115(a) of PURPA, 16 U.S.C. §§ 2621(d) and 2625(a), demonstrate a federal policy of promoting cost-of-service-based utility rates, and that policy further supports their claim that the PUC erred in declining to adopt such here. Sections 111 and 115 are found in Title I of PURPA, which is of general application, not limited to matters involving QFs. Section 111(a) requires state utility regulatory commissions to consider "ratemaking standards" established in Subsection (d) and to determine whether it is appropriate to implement such standards to effect the purposes of Title I. Those purposes are the encouragement of conservation of energy, optimization of efficiency of use of utilities' resources and equitable rates to consumers. Section 101, 16 U.S.C. § 2611. First among the standards established is cost of service. Section 115(a), relating to rules for the cost of service standard, expressly requires methods for identifying differences in cost incurrence attributable to differences in

### Discrimination in Rates under State Law

Closely related to the PURPA contentions are Armco and Allegheny Ludlum's claims that energy-only recovery of QF capacity costs violates Sections 1301 (requiring every rate made, demanded or received to be just and reasonable) and 1304 of the Code, 66 Pa.C.S. §§ 1301 and 1304. Section 1304 provides in part:

> No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service....
> This section does not prohibit the establishment of reasonable zone or group systems, or classifications of rates....

 Claims of rate discrimination arise most commonly in the context of challenges to rate structures. The burden of proving that rates approved by the Commission are unreasonable or discriminatory lies with the challenger. *Armco, Inc. v. Pennsylvania Public Utility Commission,* 54 Pa.Commonwealth 542, 422 A.2d 719 (1980). For a rate to be found unreasonably preferential, there must be a showing of advantage to one class and a resulting injury to another class. *Building Owners and Managers Association v. Pennsylvania Public Utility Commission,* 79 Pa.Commonwealth Ct. 598, 470 A.2d 1092 (1984); *Alpha Portland Cement Co. v. Public Service Commission,* 84 Pa.Superior Ct. 255 (1925).[11] This

customer demand. Title I emphasizes in several places that its provisions supplement state law and do not prohibit state authorities from adopting different standards pursuant to state law. Nevertheless, we agree with Armco that Title I shows strong federal support for cost-of-service ratemaking as a means of establishing equitable rates.

11. Stephen J. Baron (Baron), appearing on behalf of Armco and Allegheny Ludlum, testified and presented exhibits showing the substantial penalty to certain classes, including Class S46, of which Armco and Allegheny are members, and the corresponding benefit to other classes, including the S10 residential class, from failure to allocate QF capacity costs. Armco/Allegheny Ludlum Statement No. 1, Exhibits SJB 2 and

court has held repeatedly in response to challenges to particular rate structures that the establishment of rate structures is an administrative function peculiarly within the expertise of the Commission, so that if its findings are supported we must affirm. *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 122 Pa.Commonwealth Ct. 445, 552 A.2d 1135 (1989).

Both the PUC and OCA advance the remarkable argument that where all customers are charged the same rate there is no "difference" in rates; therefore, there can be no advantage to one at the expense of another.[12] This position reveals a misunderstanding of the term "rate." It is not simply the cost per unit of commodity; rather, it is defined by statute as: "Every ... fare, toll, *charge,* rental, *or other compensation whatsoever* of any public utility ... made, demanded, or received for any service within this part...." Section 102 of the Code, 66 Pa.C.S. § 102 (emphasis added).[13] We have held that differences in rates between classes based on various recognized factors, "are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation." *Philadelphia Suburban Transit Co. v. Pennsylvania Public Utility Commission*, 3 Pa.Commonwealth Ct. 184, 197, 281 A.2d 179, 186 (1971). Where different "rates" are deemed to be required (as, for example, in the base rate portion of the present case) then any decision to charge all customers the same "rate" would be error. Where the total amount of money demanded is illegally high for one customer and illegally low for another, there is "rate" discrimination, regardless of whether the mechanism

SJB 3; R.R. 753a–56a. The figures are in the hundreds of thousands of dollars.

12. This argument is not in harmony with the Commission Decision and is also inconsistent with previous orders, which do not deny that rate bias results from recovering capacity charges on an energy-only basis.

13. " 'Thus, we consider the *actual charge,* or dollar amount to be charged to the customer and not the method of calculating the charge to be the rate.' " *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission*, 81 Pa.Commonwealth Ct. 148, 159, 473 A.2d 1109, 1115 (1984) (quoting from the PUC decision in that case, interpreting Section 102, emphasis in the original).

for accomplishing that result is to charge all classes of rate-payers the same cost per unit.

OCA's citation to *Welch v. Pennsylvania Public Utility Commission,* 76 Pa.Commonwealth 158, 464 A.2d 568 (1983), is inappropriate, but it serves to dramatize the basic issue involved here. In that case the PUC accepted the recommendation of OCA that the revenue requirement be allocated across-the-board in an equal manner, and this court pronounced such allocation an "archetype" of nondiscriminatory treatment. There a uniform increase was imposed on an existing rate structure, and the result was an essentially identical rate structure. *The present case is not such a generic rate structure case.* The issue here is *not* whether the Commission acted within its discretion in selecting a particular rate structure over others that were suggested. The issue here is whether the Commission has the freedom, as to capacity costs incurred pursuant to purchases mandated by PURPA, to decline to establish any rate structure at all. For this reason the citation of the PUC and OCA to multiple cases expressing the deference of this court to the Commission's exercise of broad regulatory discretion solely under state law in regard to rate structures is inapposite.

OCA also advances the subtler argument that where non-QF capacity costs are recovered through the ECR and not allocated, then the same treatment for QF capacity costs results in an equal treatment of ratepayers, the same as if the utility "purchase[d] from another source" under 18 C.F.R. § 292.101(b)(6), and so is not inequitable. This argument ignores the fact that Section 210(a) of PURPA, 16 U.S.C. § 824a–3(a), and 18 C.F.R. § 292.301(a) require a utility to purchase all QF power that is made available, thereby preferring QF sources over non-QF sources. Where, as here, the utility has multiple sources of QF power available, proof that the utility would have purchased from a non-QF source appears unlikely, if not impossible.

OCA maintains that the Commission's decision is supported by the testimony of OTS witness Dennis Dougherty (Dougher-

ty), a Supervisor in the Commission's Bureau of Audits.[14] In its main brief to the ALJ, the OTS characterized Dougherty as an expert technician and the only witness representing solely the public interest, whose "dispassionate view as the regulator" involved "taking into account the competing interests and attempting to balance them as fairly as possible." Main Brief of the Office of Trial Staff at 75. In his prepared testimony Dougherty stated that the Commission for many years saw fit to provide for recovery of purchased power capacity costs and credits on a strict kwh basis. "It is my belief that the allocation of QF capacity costs may be only the first step in series of demand/energy allocations. While such allocations may be theoretically sound, the administrative costs associated with such a process may exceed any benefit that may be derived." OTS Statement No. 6 at 3; R.R. 831a. On oral examination, Dougherty stated that any type of demand/energy ECR would require additional staff and computers and that "any such expenditures might well exceed any benefit that might flow through to the industrial customers." N.T. 749. Although he first stated that two auditors and two additional PC's would be necessary to handle West Penn ECR matters, he later clarified that they would be necessary to monitor QF capacity ECR matters statewide. N.T. 750–51, 763–64. He also stated that he did not think the two auditors "would necessarily be new jobs created at the Commission." N.T. 750. Assuming that the ECR allocation is theoretically sound, he would still recommend no change to present practice because "the benefit would be solely to one class of customer." N.T. 757; R.R. 958a.

Such discourse dangerously diverts the Commission's attention and elevates the institutional interest of the Bureau of Audits over the public interest that the Commission is statutorily bound to protect. Balancing the "benefit" to one class and the detriment to another is at the heart of the statutory

14. OCA's position is based solely on the testimony of OTS's witness; OCA's witness, Bruce R. Oliver, stated that he made no recommendation as to whether there should be an allocation of QF capacity costs, as opposed to straight energy recovery. Notes of Testimony (N.T.) at 735; R.R. 1225a.

mandate that rates not be discriminatory. And, in any event, Dougherty did not assert PUC operations will be so disrupted by the allocations requested here as to have an adverse effect on the public interest.[15]

The Commission offered two express reasons for its decision: first, that other items, including capacity costs from non-QF purchases, also are a portion of the costs moving through the ECR. OCA and the PUC argue that this concern is a proper factor, other than cost of service, on which the PUC may rely in determining rate structure. *See* n. 4, above. The short answer is that those other transactions are not mandated by PURPA and are not governed by the federal requirement of ratepayer indifference previously discussed. Most parties agreed that if the PURPA-governed capacity costs were to be allocated in the ECR, then in fairness capacity costs from other types of purchases and credits from off-system sales of capacity also should be allocated. The ALJ expressed that view as well, but he declined to act on it because he did not believe the subject to be within the scope of the PUC's order of June 15, 1990, and he did not believe that the record was developed sufficiently on that question for him to make a specific recommendation. That other inequities may exist under state law (which are subject to future correction) does not excuse a violation of PURPA.

The Commission's other reason, which it conceded was not raised by any party or developed on the record, is that QF capacity is different from utility-owned capacity in that payments for it are production performance based. The Commission stated that if QF payments were of a more fixed nature, such as kilowatts per year, which might develop under a bidding program, then base rate treatment might be appropriate.

15. Dougherty also spoke concerning the separate interest of keeping yearly ECR reconciliation proceedings from becoming as complex and litigious as base rate cases. This very legitimate concern was also addressed by the ALJ specifically. The PUC's claim that sustaining these appeals will have such a result ignores the ALJ's careful direction that the same cost-of-service method be applied as is used in base rates and that the classes themselves be established in a base rate proceeding.

The fundamental flaw in the Commission's reasoning is a failure to acknowledge that capacity is capacity, whether it comes from a QF or from another source. If the capacity from Milesburg and from the already-producing QFs is not "real" capacity, then the QFs are not entitled to a capacity component for their charges, and the PUC should not have approved the utility-QF contracts providing for capacity payments. In reality, the Commission had approved those contracts, and West Penn's ratepayers currently are paying real money for QF capacity already on line, and they will pay a higher rate when capacity charges from the QFs involved here are recovered.

The Commission is correct that not all sources of capacity have the same degree of reliability, but the FERC regulations take that fact into account. *See* 18 C.F.R. § 292.304(e)(2)(ii) (expected or demonstrated reliability of the QF is among the factors to be considered in determining rates for purchases from QFs). In addition, the Commission's regulations provide for penalties against QFs that are receiving capacity payments, but whose output falls by a specified amount, and they provide a method for payment of such penalties. 52 Pa.Code § 57.34(c)(9). This serves to ameliorate any reliability problems that might arise.[16]

In the present case, West Penn and the QFs negotiated their contracts and then submitted them to the PUC for approval, as permitted by 18 C.F.R. § 292.301(b) and 52 Pa.Code § 57.32(c), and the PUC conducted a review in the petition proceedings to determine whether the contracts provided for QF charges at or below FAC and whether they were otherwise in accordance with PURPA and the applicable regulations. The negotiation and review processes included scrutiny of QF reliability. Under PURPA, the Commission cannot, at this juncture, determine that QF capacity is something that does not merit treatment as "real" capacity. Also, by recog-

---

16. In the preamble to the PUC's publication of its regulations relating to QF purchases, the Commission stated that it rejected a suggestion that the proposed capacity penalties be eliminated, because "[u]tilities must be assured a relatively stable source of capacity if credits are to be granted." 12 Pa.B. 4240.

nizing that QF capacity is real capacity the Commission's second rationale is invalidated. Failure to allocate these costs creates a rate bias, as the Commission itself acknowledged, and the Commission's order violates Section 1304 of the Code.[17]

In view of our resolution of the substantive issues, we need not address the claim of Allegheny Ludlum that the Commission violated the requirement of Section 703(e) of the Code, 66 Pa.C.S. § 703(e), by failing to file findings with its order of "sufficient detail to enable the court on appeal to determine the controverted question . . ., and whether proper weight was given to the evidence," and the related claim of Armco that, in view of the Commission's previous orders, its decision here is arbitrary and capricious.[18]

17. The PUC argues that the Commission's decision in *AES Beaver Valley* supports treatment of capacity charges as energy charges. The Commission's ruling in the *Milesburg Remand* that failure to allocate QF capacity costs creates rate bias is inconsistent with, and therefore overrules, its 1985 decision in *AES Beaver Valley*. There the Commission sought to assure that utilities recovered payments to QFs dollar-for-dollar and as quickly and simply as possible. It selected the ECR as the only available mechanism to accomplish that result. The Commission went on to state that characterization as energy or capacity was important for calculation of the payments to the QF, but that once the price was decided the transaction became identical to any other energy purchase. As the discussion above indicates, PURPA requires protection of ratepayers from inequitable charges caused by QF purchases, hence the Commission is not free to treat QF capacity charges as energy charges.

18. We note that the Commission's order violates Section 703(g) of the Code, 66 Pa.C.S. § 703(g), which confers upon the Commission the power to rescind or amend a final order "after notice and after opportunity to be heard. . . ." The *Milesburg Remand* orders provided that QF capacity costs be recovered through the ECR on a demand/energy basis and postponed only the determination of the particular method, or remedy. As noted above, no party sought review of that aspect of those orders. The order of June 15, 1990, provided notice that the Commission would also consider base rate (automatically allocated) recovery of QF capacity costs, but it did not provide notice that the PUC might reverse the previous orders by deciding *not* to allocate such costs. OTS as a party litigant before the Commission does not speak for the PUC, and by advocating no change does not provide the notice required by Section 703(g). *See* Section 306(b) of the Code, 66 Pa.C.S. § 306(b), relating to powers and duties of the OTS. Moreover, although OTS's witness Dougherty stated in his prepared testimony that his purpose was to request that the Commission recon-

Accordingly, we reverse the Commission Decision insofar as it determined not to provide some method of allocating capacity costs incurred pursuant to purchases mandated by PURPA, and we remand for further proceedings.

## ORDER

AND NOW, this 25th day of June, 1992, the Order of the Pennsylvania Public Utility Commission at Docket Nos. R–901609 *et seq.*, entered December 14, 1990, is reversed as to the Commission's decision not to provide a method of allocation of the capacity costs incurred pursuant to the mandates of the Public Utility Regulatory Policies Act of 1978, and this case is remanded to the Commission for further proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

sider its order of June 15, 1990, OTS Statement No. 6 at 2; R.R. 830a, he later clarified that, although he suggested that the Commission "rethink the entire area of allocating QF capacity costs," he did *not* suggest that the Commission entertain a motion to reconsider the June 15, 1990, order. OTS Statement No. 6 (clarified) at 1; R.R. 856a. Consequently, there was never any notice required by Section 703(g) that the *Milesburg Remand* orders for allocation might be rescinded. *Compare Scott Paper Co. v. Pennsylvania Public Utility Commission*, 126 Pa.Commonwealth Ct. 111, 558 A.2d 914 (1989) (Commission's approval of utility's compliance filing after rate case, which included provision affecting rates contrary to the terms of the rate case order, constituted amendment of prior order without notice or opportunity to be heard in violation of Section 703(g)).