**SOUTH RIVER POWER PARTNERS, L.P., Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 5, 1997.

Decided July 9, 1997.

order.

6. This letter (R.R. pp. 42a–43a) was stricken from the record by this Court's August 28, 1996

Clifford B. Levine, Pittsburgh, for petitioner.

Kathryn G. Sophy, Harrisburg, for respondent.

Steven F. Baicker–McKee, Pittsburgh, for intervenor, Allegheny Ludlum Corp.

Michael D. McDowell, Greensburg, for intervenor, West Penn Power Co.

Before PELLEGRINI and FLAHERTY, JJ., and SILVESTRI, Senior Judge.

PELLEGRINI, Judge.

South River Power Partners (South River) appeals an order of the Pennsylvania Public Utility Commission (PUC) granting West Penn Power Company's (West Penn) motion for summary judgment and dismissing South River's complaint filed against West Penn in which it alleged that West Penn refused to purchase power from its proposed power facility.

South River is a special purpose limited partnership that was established in 1993 for the sole purpose of developing a proposed 240 megawatt (MW) waste coal and coal-fired electric power facility in Fayette County, Pennsylvania. South River proposed to develop this facility, also referred to as a qualifying facility or QF,[1] based on its belief that West Penn, as a public utility, had a need for an additional 240 MW of capacity within the next ten years for which it had not made sufficient provisions. It sought to sell this capacity to West Penn.

South River's proposal came about as a result of the federal Public Utility Regulatory Policies Act of 1978 (PURPA),[2] which was originally enacted in 1978 to combat the nationwide energy crisis of the early 1970's resulting from increased oil prices and natural gas shortages. *FERC v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). Section 210(a) of PURPA, 16 U.S.C. § 824a–3, directed the Federal Energy Regulatory Commission (FERC) to promulgate rules to encourage the development of alternative sources of power, including rules requiring utilities to offer to buy electricity from and to sell electricity to QFs. FERC enacted such regulations and required each state to implement PURPA as it saw fit. *See* 18 C.F.R. Part 292.

■ As we explained in *Pennsylvania Electric Company v. Pennsylvania Public Utility Commission*, 166 Pa.Cmwlth. 413, 648 A.2d 63, 69 (1994), pursuant to FERC's mandate:

> [T]he Pennsylvania PUC enacted regulations at 52 Pa.Code § 57.31 *et seq.* adopting rules regarding the purchase and sale of energy and capacity from QFs. Under 52 Pa.Code § 57.32(a), the PUC specifically delineated that electric utility consumers were to be protected, as well as equalizing the bargaining power between QFs and utilities. The intention was to ensure that the purchasing utility and its customers were in the same or similar position to what they would have been if capacity and energy had not been purchased from a QF. *See Allegheny Ludlum Corporation v. Pennsylvania Public Utility Commission*, 149 Pa.Cmwlth. 106, 612 A.2d 604 (1992). This was accomplished by ensuring that the utility's avoided costs of purchasing capacity and energy from a QF rather than building and operating its own facility was equal to or less than utility produced power so that its rates to consumers did not increase as a result.

Because West Penn refused to negotiate with South River since it believed it did not have a future need for more power, South

---

1. A QF is a non-utility supplier of electric power under the Pennsylvania Utility Code, 52 Pa.Code § 57.31. On September 10, 1993, South River filed a notice of QF self-certification with the Federal Energy Regulatory Commission (FERC) indicating that the project is a qualifying small power production facility under FERC's criteria set forth at 18 C.F.R. §§ 292.203, 292.204 and 292.206.

2. 16 U.S.C. § 824a–3, *et seq.*

River tendered a contract which it had executed to West Penn for the sale of electrical capacity and energy from its QF.[3] West Penn refused to sign the contract.

South River filed a complaint with the PUC against West Penn on October 28, 1993, requesting relief under PURPA and the Commission's regulations in the form of an order directing West Penn to enter into a contract for the long-term purchase of electrical capacity and energy from its proposed QF. The matter was referred to an administrative law judge (ALJ) for hearing. After discovery and before a hearing took place, West Penn filed a motion for summary judgment arguing that South River did not, as a matter of law, create a "legally enforceable obligation" requiring it to purchase South River's power because its project was not viable or developed, but merely a paper project.

■ In his Initial Decision, the ALJ agreed that South River's proposed QF was not a viable project but nothing more than a concept because South River was essentially a shell corporation erected only for the purpose of filing the complaint before him. The ALJ did not find evidence in the record that South River was able financially or otherwise to provide West Penn and its customers with the 240 MW of power that it was offering. Because of that, the ALJ concluded that there was no "legally enforceable obligation" existing under PURPA and granted West Penn's motion for summary judgment and dismissed South River's complaint. South River filed exceptions to the ALJ's decision with the PUC which, after adopting and affirming the ALJ's Initial Decision, the PUC denied. This appeal by South River followed.[4]

**3.** The contract, which required West Penn to purchase capacity and energy from South River at a rate of 9.02 cents per Kwh for 33 years, would allow South River to make approximately $162,000,000. per year for the sale of its capacity and energy.

**4.** Our scope of review from an adjudication of the PUC is limited to determining whether constitutional rights have been violated, an error of law committed, or whether necessary findings of fact are supported by substantial evidence. *Bar-*

South River contends that the PUC's order granting West Penn's motion for summary judgment was an abuse of discretion because it was premised on an erroneous interpretation of when a "legally enforceable obligation" is created.[5] The term "legally enforceable obligation" comes from language found under PURPA at 16 U.S.C. § 824a–3 requiring utilities to purchase capacity from QFs at a rate that does not exceed the utility's avoided cost as of the time a "legally enforceable obligation" between the utility and the QF is created. While the term "legally enforceable obligation" is used, it is not defined under PURPA. Because the implementation of PURPA was entrusted to the states under 18 C.F.R. § 292.401, different states adopted their own standards with respect to when a "legally enforceable obligation" was created.

South River argues that pursuant to the holdings in *Armco Advanced Materials Corporation v. Pennsylvania Public Utility Commission (Milesburg II)*, 135 Pa. Cmwlth.15, 579 A.2d 1337 (1990), *affirmed*, 535 Pa. 108, 634 A.2d 207 (1993), *cert. denied*, 513 U.S. 925, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994) and *Pennsylvania Electric Company v. Pennsylvania Public Utility Commission (Penelec)*, 166 Pa.Cmwlth. 413, 648 A.2d 63 (1994), *affirmed*, 544 Pa. 475, 677 A.2d 831 (1996), a legally enforceable obligation is created when a utility willingly enters into a contract with a QF, or when a QF, as it did here, tenders a contract to a public utility or files a petition with the PUC to compel the utility to purchase power. Once it tendered a contract to West Penn and/or filed a petition with the PUC, South River contends the PUC was obligated, without any discretion to determine if the QF was viable, to order West Penn to enter into

*asch v. Pennsylvania Public Utility Commission*, 507 Pa. 561, 493 A.2d 653 (1985).

**5.** Section 5.102(c) of the Pennsylvania Public Utility Code provides that a motion for summary judgment may only be granted:

if the pleadings, depositions, answers to interrogatories and admissions, together with affidavits, if any, show that there is no genuine issue as to a material fact and that the moving participant is entitled to a judgment as a matter of law.

a contract with South River for the purchase of power because a legally enforceable obligation had been created. South River believes that the PUC refused to do so because it equated a "legally enforceable obligation" with a binding contract and required full project development to create a legally enforceable obligation by the QF rather than the mere tendering of a contract or filing with the PUC as it contends is required under *Milesburg II* and *Penelec*.

In *Milesburg II*, West Penn and a QF had already executed an agreement for the purchase of capacity and energy, and the issue was not whether the project was viable, but whether the date of serious negotiations between the QF and the utility created a legally enforceable obligation for purposes of fixing the date of the avoided cost. In that context, where there was a signed agreement not questioning the viability of the project or capabilities of the owners, we held that the standard for creating a "legally enforceable obligation" was as follows:

Where a QF has entered into a contract with a utility, the QF has a legally enforceable obligation to deliver power. *Where a QF has done everything within its power to create such an obligation, either by tendering a contract to the utility or by petitioning the PUC to approve a contract or to compel a purchase, and only an act of acceptance by the utility or an act of approval by the PUC remains to establish the existence of a contract,* then the legally enforceable obligation contemplated by § 292.304(d)(2) has been created and the QF is entitled to rates based on avoided costs calculated from the date of the QF's action.

However, the legally enforceable obligation we have just described *does not exist* at a time during serious negotiations between the parties (whether at the time of agreement in principle on price or otherwise) *when the QF has not yet obligated itself to deliver power and remains free to walk away from the negotiations without any liability.*

Although the "legally enforceable obligation" language does permit a QF to lock in avoided cost projections even without a contract from a recalcitrant utility, the phrase does not encompass a QF that has incurred no obligation at all. (Emphasis added.)

579 A.2d at 1345, 1347.

Because West Penn had agreed to purchase power in *Milesburg II*, we did not address what steps the QF had to take to be considered sufficiently developed so that it would have the ability to carry out its responsibilities. The underlying assumption made by the PUC and adopted by this court was that the project was viable. In *Milesburg II*, at issue was only the date for fixing the avoided cost when the QF could show that it was able to incur the obligation of providing power and capacity.

Similarly, the Supreme Court in *Penelec* was asked to determine whether the date a petition to compel a purchase was filed with the PUC was the date to be used to calculate capacity needs and avoided costs, not whether the competing QFs' projects were viable. In that case, our Supreme Court noted, "The PUC assigned priorities to the competing QFs based on the extent of their development, the quality of existing utility service in their locales, the viability of the various proposals, and the sequence in which the QFs filed their petitions with the PUC." *Penelec*, 677 A.2d at 833. Once again, the viability of the projects was an underlying assumption made by the PUC, this court and our Supreme Court.

As can be seen from our review of these cases, whether full project development was required to create a "legally enforceable obligation"—i.e., whether there was a viable project—was not addressed in those cases. *Milesburg II* and *Penelec* only addressed the triggering device and timing of the creation of a legally enforceable obligation, not the prerequisites for that creation. Because those cases did not create the standard necessary to determine if a project is viable and whether the PUC has discretion to make that determination, South River's reliance on them is misplaced.

■ As to whether the PUC abused its discretion by determining that the viability of the project has to be shown, other states

have considered various factors in making such a determination.[6] For example, in *Appeal of Public Service Company of New Hampshire*, 130 N.H. 285, 539 A.2d 275 (1988), the Supreme Court of New Hampshire held that a legally enforceable obligation was created when the utility filed a rate petition accompanied by an interconnection agreement signed by the small power producer. However, the rate petition had to demonstrate that most of the developmental problems had been resolved giving rise to a reasonable expectation that the project would be on-line on the date specified in the rate filing, and the QF had to demonstrate the economic viability of its project over the life of the project.

Regarding the development of the project, the Supreme Court of New Hampshire determined that the problems had been resolved as the PUC had properly found that the critical permits had been obtained; the QF had received site development approval from the City of Rochester and an air quality permit from the New Hampshire Air Resources Division; had secured property rights to the project site; had negotiated a steam sales contract; had demonstrated that the project design and construction planning had advanced to the stage where "not-to-exceed" construction quotations had been provided by reliable design and construction firms; and financing arrangements had advanced to a stage where a rate order was warranted. Regarding the economic viability of the project, the QF had provided sufficient assurances that the project was viable; the QF had an offer from New England Agencies, Inc. for a 20 year fuel contract; the PUC conditioned its order on the QF creating a reserve fund to meet any cash deficiencies in the later years of the project; and the PUC required the QF to place a junior lien on the project in favor of the utility.

In *Smith Cogeneration Management, Inc. v. Corporation Commission and Public Service Company of Oklahoma*, 863 P.2d 1227 (Okla.1993), the Supreme Court of Oklahoma determined that a QF had not established a legally enforceable obligation for the sale of power. Not only had the QF not presented a contract to the Corporation Commission which obligated it to deliver power to the utility, it also did not attempt to obtain a contract for construction, operation and maintenance of the proposed project, and did not attempt to obtain a contract for the purchase of natural gas.

■ Even though Pennsylvania is not bound by those interpretations, the PUC adopted a similar approach and found that the proposed project had to be viable using similar factors holding that substantial action had to be undertaken to acquire the necessary permits, site development approval, construction plans and financing. In concluding that South River was not a viable project, the PUC determined that South River:

● had no assets, liabilities or net worth;

● had no written partnership or limited partnership agreement;

● had no current or past employees;

● had not been associated with any other power production project;

● had not applied for or obtained any of the governmental permits and approvals that would be required for its project;

● had not engaged any consultant to assist in applying for those permits and approvals and had not made any preparations to do so; and

● had only held discussions with investment bankers but had not received financing for the project.

Additionally, the record established that contrary to South River's contentions, it did not have any agreement with Gallatin Fuels, Dunkard Mining Company or Target Mining Company to establish either a fuel source or a site for the project, and it had not undertaken any efforts to pursue or obtain geotechnical, architectural design, engineering, construction and construction management services prior to June 2, 1994, the date the

---

6. It is appropriate that we look to other states for their interpretation of the term "legally enforceable obligation" in order to make the state's interpretation of PURPA uniform. Pursuant to Section 3 of the Statutory Construction Act, Act of December 6, 1972, 1 Pa.C.S. § 1927, statutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them.

PUC approved interim competitive bidding requirements for the purchase of energy or capacity by West Penn.[7] Even if the PUC had adopted a more lax standard than other states to determine if there was a "legally enforceable obligation", South River has shown that it is nothing more than a paper project and not a viable one that is necessary to create a legally enforceable obligation under PURPA.

■ Consequently, because the PUC thoroughly reviewed the actions South River had taken to create a legally enforceable obligation and determined that South River had done nothing more than tender a contract to West Penn and file a petition with the PUC, it did not abuse its discretion by granting summary judgment in favor of West Penn and dismissing South River's petition.[8]

Accordingly, the decision of the PUC is affirmed.

### ORDER

AND NOW, this 9th day of July, 1997, the order of the Pennsylvania Public Utility Commission, dated November 6, 1996, is affirmed.

LEADBETTER, J., did not participate in the decision of this case.

---

7. The PUC promulgated new regulations adopting competitive bidding requirements on June 22, 1995, published at 25 *Pennsylvania Bulletin* 6085 (December 30, 1995). Prior to that date, West Penn petitioned the PUC to issue an order that any proceedings concerning purchases by West Penn of capacity from QFs pursuant to PURPA be based on competitive bidding after a PUC finding of a need for additional capacity by West Penn. The PUC granted West Penn's petition to utilize a competitive bidding program and noted that if it dismissed South River's complaint, South River would be required to participate in any interim competitive bidding process conducted by West Penn in order to have the opportunity to sell capacity and energy to West Penn.

8. While South River argues that the PUC abused its discretion, an abuse of discretion only arises where a judgment is manifestly unreasonable or is the result of partiality, prejudice, bias or ill-will as shown by the record. *UGI Utilities—Gas Division v. Pennsylvania Public Utility Commission,* 673 A.2d 43 (Pa.Cmwlth.1996). The court will not overturn an administrative agency's exercise of its discretion absent proof of fraud, bad faith or blatant abuse of discretion. *Shenango Township Board of Supervisors v. Pennsylvania Public Utility Commission,* 686 A.2d 910 (Pa. Cmwlth.1996).