**[J-39A-2025, J-39B-2025 and J-39C-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| DARRYL A. LAWRENCE, ACTING CONSUMER ADVOCATE, | : | No. 47 MAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the Commonwealth Court at No. 910 CD 2022 entered on July 31, 2023, reversing the Decision of the Public Utility Commission at No. A-2021-3026132 entered on July 29, 2022 |
| v. | : | |
| PENNSYLVANIA PUBLIC UTILITY COMMISSION, | : | ARGUED: May 14, 2025 |
| | : | |
| Appellant | : | |
| DARRYL A. LAWRENCE, ACTING CONSUMER ADVOCATE | : | No. 48 MAP 2024 |
| | : | |
| v. | : | Appeal from the Order of the Commonwealth Court at No. 910 CD 2022 entered on July 31, 2023, reversing the Decision of the Public Utility Commission at No. A-2021-3026132 entered on July 29, 2022 |
| PENNSYLVANIA PUBLIC UTILITY COMMISSION | : | |
| | : | ARGUED: May 14, 2025 |
| APPEAL OF: EAST WHITELAND TOWNSHIP | : | |
| DARRYL A. LAWRENCE, ACTING CONSUMER ADVOCATE | : | No. 49 MAP 2024 |
| | : | |
| v. | : | Appeal from the Order of the Commonwealth Court at No. 910 CD 2022 entered on July 31, 2023, reversing the Decision of the Public Utility Commission at No. A-2021-3026132 entered on July 29, 2022 |
| PENNSYLVANIA PUBLIC UTILITY COMMISSION | : | |
| | : | ARGUED: May 14, 2025 |

APPEAL OF: AQUA PENNSYLVANIA     :
WASTEWATER, INC.                 :

## OPINION

**JUSTICE MUNDY**                            **DECIDED:  December 16, 2025**

Aqua Pennsylvania Wastewater, Inc. ("Aqua") entered into an agreement with East Whiteland Township (the "Township") to purchase the assets of the Township's wastewater collection system (the "System").  Aqua and the Township engaged in the process set forth in Section 1329 of the Public Utility Code (the "Code"), 66 Pa.C.S. § 1329, to determine the fair market value of the System's assets.  As part of that process Aqua was required to apply for a Certificate of Public Convenience ("CPC") from the Pennsylvania Public Utility Commission ("PUC") in compliance with Section 1102 of the Code, 66 Pa.C.S. § 1102.  Applying the requirements to obtain a CPC pursuant to Section 1103 of the Code, 66 Pa.C.S. § 1103, and caselaw interpreting those requirements, the PUC granted Aqua's application.  The Commonwealth Court, however, found the PUC erred and that Aqua was not entitled to the CPC.  We determine the Commonwealth Court misapplied the Code and our precedent in coming to that conclusion and, therefore, reverse its decision and remand for further proceedings consistent with this opinion.

## I.  Background

### A. Legal Background

Pursuant to the Code, the standard method of valuing the property included in a public utility's rate base[1] is the "original cost of the property when first devoted to the public service less the applicable accrued depreciation as such depreciation is

---

[1] "Rate base" is defined under the Code as "[t]he value of the whole or any part of the property of a public utility which is used and useful in the public service."  66 Pa.C.S. § 102 (Definitions).

determined by the [C]ommission." 66 Pa.C.S. § 1311(b)(1). In 1990, the General Assembly created a narrow exception to this cost minus depreciation valuation method for the acquisition of water and sewer utilities, stating "[i]f a public utility acquires property from another public utility, a municipal corporation or a person at a cost which is in excess of the original cost of the property when first devoted to public service less the applicable accrued depreciation, it shall be a rebuttable presumption that the excess is reasonable and that excess shall be included in the rate base of the acquiring public utility[.]" 66 Pa.C.S. § 1327(a). That exception, however, only applies if, *inter alia*, the acquired utility "had 3,300 or fewer customer connections or which was nonviable in the absence of the acquisition" and "was not, at the time of the acquisition, furnishing and maintaining adequate, efficient, safe and reasonable service and facilities[.]" *Id.* at § 1327(a)(2), (3). Therefore, under the exception created by Section 1327 of the Code, a public utility acquiring another water or sewer public utility was still required to use the cost minus depreciation valuation method unless (1) the acquired utility had 3,300 or fewer customer connections or was nonviable in the absence of the acquisition and (2) was not providing adequate, efficient, safe, and reasonable services at the time of the acquisition.

That was the situation until 2016, when the General Assembly created an exception to the cost minus depreciation valuation method for the valuation of acquired water and wastewater systems which is not limited to the acquisition of small or nonviable systems that are not providing adequate services. Section 1329 of the Code created a process where, upon agreement of the acquiring and selling utilities[2] engaged in a

---

[2] Section 1329 defines an "acquiring public utility" as "[a] water or wastewater public utility subject to regulation under this title that is acquiring a selling utility as the result of a voluntary arm's-length transaction between the buyer and seller." 66 Pa.C.S. § 1329(g). A "selling utility" is defined by the statute as "[a] water or wastewater company located in this Commonwealth, owned by a municipal corporation or authority that is being purchased by an acquiring public utility or entity as the result of a voluntary arm's-length transaction between the buyer and seller." *Id.*

transaction for the purchase of the selling utility, the parties can engage in a procedure to determine the fair market value (the "FMV") of the selling utility. 66 Pa.C.S. § 1329(a). If the parties opt for this procedure, the ratemaking base rate[3] of the selling utility "shall be the lesser of the purchase price negotiated by the acquiring public utility or entity and selling utility or the fair market value of the selling utility." *Id.* at § 1329(c)(2).[4] The selling utility's ratemaking rate base shall then be incorporated into the rate base of (1) the acquiring public utility during its next base rate case or (2) the entity in its initial tariff filing. *Id.* at § 1329(c)(1)(i), (ii). Unlike Section 1327, Section 1329 does not limit the availability of the fair market valuation method to small, nonviable selling utilities that are not providing adequate service. *See id.* at § 1329(g) (definitions of acquiring and selling utilities).

When the parties proceed with Section 1329's fair market valuation process, the acquiring utility or entity must obtain a CPC from the Commission in accordance with Section 1102 of the Code. *See id*. § 1329(d)(1), (e). Pursuant to Section 1102, a CPC is required before a public utility may (1) provide services in a different territory than it is currently providing those services or (2) acquire from, *inter alia*, a municipal corporation title to property used to provide public services. *See* 66 Pa.C.S. § 1102(a)(1), (3). Hence, an acquiring utility is required to obtain a new CPC prior to purchasing the property of a

---

[3] The "[r]atemaking base rate" is "[t]he dollar value of a selling utility which, for postacquisition ratemaking purposes, is incorporated into the rate base of the acquiring public utility or entity." *Id*. at § 1329(g).

[4] Pursuant to Section 1329, in order to determine the FMV of the selling authority, the acquiring authority or entity and the selling authority each choose a utility valuation expert from a list of experts maintained by the Commission. *See* 66 Pa.C.S. § 1329(a)(1). Each utility evaluation expert will perform a separate appraisal of the selling utility in compliance with the Uniform Standards of Professional Appraisal Practice, employing the cost, market, and income approaches. *See id*. at § 1329(a)(2), (3). The FMV is then the "average of the two utility valuation expert appraisals[.]" *Id.* at § 1329(g).

selling utility or providing services to that selling utility's customers, even when the acquiring utility already holds a CPC to provide those services in a different territory.

The procedure to obtain a CPC is set forth in Section 1103 of the Code, 66 Pa.C.S. § 1103. Pursuant to Section 1103, in order to obtain a CPC, a public utility must file an application with the Commission. The application shall be granted "only if the [C]ommission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public." *Id*. at § 1103(a). Moreover, to obtain the CPC, an applicant has the burden, by a preponderance of evidence, to establish that it is technically, legally, and financially fit to provide the proposed service. *McCloskey v. Pa. Pub. Util. Comm'n.*, 195 A.3d 1055, 1058 (Pa. Cmwlth. 2018) (citing *Seaboard Tank Lines, Inc. v. Pa. Pub. Util. Comm'n.,* 502 A.2d 762, 763 n.1 (Pa. Cmwlth. 1985)). A certified public utility enjoys a presumption that it is fit. *Id.* Furthermore, in granting a CPC, the Commission "may impose such conditions as it may deem to be just and reasonable." 66 Pa.C.S. § 1103(a).

In *City of York v. Pennsylvania Public Utility Commission,* 295 A.2d 825 (Pa. 1972), we interpreted Section 1103's predecessor, which contained the same requirement that the Commission was not to grant a CPC unless it was "necessary or proper for the service, accommodation, convenience, or safety of the public[.]" *Id.* at 828 (quoting former 66 P.S. § 1123). There, the City of York and York County appealed the PUC's grant of a CPC approving the merger of three telecommunications companies operating in the City of York. *Id.* at 827. On appeal, this Court overruled our prior precedent holding that a "utility subject to the jurisdiction of the [PUC] has the right to sell its property and thereby effect a merger with another utility 'unless it is established, by competent evidence, that the sale will adversely affect the public in some substantial way.'" *Id.* at 828 (quoting *N. Pa. Power Co. v. Pa. Pub. Util. Comm'n*, 5 A.2d 133, 134 (Pa. 1929)).

Instead, we held that the statute was "clear that a [CPC] approving a merger is not to be granted unless the Commission is able to find affirmatively that public benefit will result from the merger." *Id.* In determining if a merger would have a public benefit, this Court directed that the Commission "should consider, at least in a general fashion, the effect that a proposed merger is likely to have on future rates to consumers." *Id.* at 829. In that regard, we stated that "[a]long with the likely effect of a proposed merger upon the service that will be rendered to consumers, the probable general effect of the merger upon rates is certainly a relevant criteria of whether the merger will benefit the public." *Id*.

We again addressed the Commission's grant of a CPC in the merger context in *Popowsky v. Pennsylvania Public Utility Commission*, 937 A.2d 1040 (Pa. 2007), where we reviewed the Commission's grant of a CPC in connection with a proposed merger of telecommunications companies Verizon and MCI. There, we stated:

> [A]s indicated in *City of York*, the appropriate legal framework requires a reviewing court to determine whether substantial evidence supports the Commission's finding that a merger will affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way. In conducting the underlying inquiry, the Commission is not required to secure legally binding commitments or to quantify benefits where this may be impractical, burdensome, or impossible; rather, the PUC properly applies a preponderance of the evidence standard to make factually-based determinations (including predictive ones informed by expert judgment) concerning certification matters.

931 A.2d at 1057 (footnote removed). This affirmative public benefits standard does not require that all "types of customers receive unique, affirmative, and direct benefits from the transaction[.]" *Id.* at 1061. Consequently, as to the Commission's consideration of the merger's impact on rates, the *Popowsky* Court stated that *City of York* "does not hold that a merger benefits the public *only* if the PUC can demonstrate that the merger savings will lower prices to consumers." *Id.* at 1056 (emphasis in original). Rather, the Court reiterated that the Commission must consider the impact on future rates charged to consumers "'at least in a general fashion,' or the 'probable general effect of the merger

upon rates,' … as a component of a net benefits assessment." *Id.* (quoting *City of York*, 295 A.2d at 829).

Both *City of York* and *Popowsky* were decided prior to the General Assembly's enactment of Section 1329, and we have yet to address the grant of a CPC in the context of a 1329 transaction. The Commonwealth Court, however, addressed such a situation in *McCloskey*, where it applied the substantial affirmative benefits test as set out in *City of York* and *Popowsky*. The court found that the acquiring utility's size, expertise, and ability to raise capital along with the Commission's policy supporting regionalization and consolidation in the wastewater business could support the notion that there is a public benefit to the transaction so as to satisfy the substantial affirmative public benefits test. *Id.* at 1065. As to the consideration of the transaction's impact on rates, the court rejected the Commission's contention that "a Section 1329 acquisition proceeding is not the appropriate context for addressing ratemaking issues because without cost studies, potential cost allocation or possible rate designs, the Commission would be asked to determine the impact on rates without sufficient or substantial evidence." *Id.* at 1066. Instead, the court held that because *City of York* requires rate impact to be considered as part of a CPC request, "the Commission must address that impact when deciding whether there is substantial public benefit." *Id.*

**B. Factual and Procedural Background**

Aqua is an investor-owned, certified public utility that holds a CPC to provide wastewater service to approximately 45,000 customers in various counties within Pennsylvania, including Chester County, wherein the Township is located. The Township owns the System, which provides sanitary wastewater services to approximately 3,895 of its residents. Aqua currently owns and operates the Township's water system as compared to its wastewater system. The Township and Aqua entered into an agreement

for Aqua to purchase the System's assets from the Township for $54,930,000.00. The parties opted to utilize the process set forth in Section 1329 for the transaction, through which they ascertained an FMV of the System's assets of $56,724,729.00. As part of the agreement, Aqua agreed to continue the Township's existing rates for at least three years after closing and filed an application with the Commission, seeking, *inter alia*, a CPC to offer service to the Township's customers, and a ratemaking rate base of $54,930,000.00.[5]

The application was assigned to an Administrative Law Judge ("ALJ") within the Commission. The Office of Consumer Advocate ("OCA"),[6] along with a Township customer, filed a protest to the application. The OCA argued that Aqua's acquisition of the System was not in the public's interest. The ALJ first held a telephone public input hearing, where several individuals presented statements raising concerns with Aqua's acquisition, including that customer rates would increase, the System operated without issue for decades, and Aqua had not provided safe water services at times. The ALJ then held an evidentiary hearing where the OCA, Aqua, and the Township all submitted testimony and exhibits into the record. After the hearing, the ALJ issued a recommended decision to deny Aqua's application for a CPC.

In so recommending, the ALJ credited the evidence of the public opposition to the purchase, including that the Township's service was safe and reliable without being acquired by Aqua. As to the transaction's impact on rates, the ALJ credited the OCA's

---

[5] Aqua sought to establish a ratemaking rate base of $54,930,000.00 for the System's assets based on the negotiated purchase price because the purchase price was less than the average of the FMV appraisals of the assets, which was $56,724,729.00. *See* 66 Pa.C.S. § 1329(c)(2) ("The ratemaking rate base of the selling utility shall be the lesser of the purchase price negotiated by the acquiring public utility or entity and selling utility of the fair market value of the selling utility.").

[6] The OCA was established to represent the interest of consumers before the Commission. 71 P.S. § 309-2(a).

unrebutted evidence that the transaction would result in a $5,011,000.00 yearly revenue deficiency and the Township's customer's rates would increase by approximately 132% if they were required to cover the entire deficiency. If, on the other hand, the deficiency was split between the Township's customers and Aqua's current customers, the Township customers would face an approximate rate increase of 66% while Aqua's current customers would also face a rate increase.

Furthermore, though there was no dispute that Aqua was fit to provide the proposed service,[7] the ALJ determined Aqua's evidence identifying the alleged substantial affirmative public benefits of its acquisition were not proved with specificity or were not improvements for the System's customers. In support of this latter conclusion, the ALJ observed the Township was already providing reliable and safe wastewater services and had the financial capabilities to make the needed capital improvements to the System. Thus, the ALJ found "Aqua [had] failed to establish that the sewer system under Aqua's ownership [would] affirmatively promote the service, accommodation, convenience, or safety of the public[]" and "the evidence did not establish that any benefit to be realized from the proposed transaction would outweigh the harms to current Aqua water and wastewater customers or existing [ ] Township wastewater customers." ALJ Recommended Decision at 59. As a result, the ALJ determined that Aqua failed to meet its burden under Sections 1102 and 1103 of the Code and that the acquisition would not result in an affirmative public benefit.

Aqua and the Township filed exceptions to the ALJ's recommended decision with the Commission. Relative to the issues currently before this Court, Aqua challenged the ALJ's determination that it failed to establish its acquisition of the System would result in

---

[7] As a certified public utility, Aqua enjoys a presumption that it is fit to provide the services to the Township's customers. *See McCloskey*, 195 A.3d at 1058. The opponents to Aqua's acquisition of the System did not, and do not, challenge this presumption.

an affirmative public benefit and that adverse impacts to Aqua's existing customers and Township customers outweighed the transaction's benefits. For its part, the Township echoed Aqua's challenges and additionally argued that the standard set out by the ALJ would require a municipal wastewater system to be nonviable before it could be sold under the Code.

In a 133-page decision, the Commission disagreed with the ALJ's recommendation and granted the exceptions filed by Aqua and the Township relative to Aqua's application for a CPC. In so doing, the Commission found there was no credible dispute that Aqua was financially and technically fit to be the certificated provider for the System. Moreover, it determined Aqua's evidence established numerous public benefits, including, *inter alia,* Aqua's financial, technical, and managerial expertise in the water and wastewater industry and the fact that Aqua already owned the Township's water authority. Furthermore, the Commission added that the transaction furthered its public policy goals of promoting the consolidation and regionalization of wastewater systems through the purchase of smaller systems by larger, more viable systems, which, according to the Commission, is consistent with the General Assembly's intent in enacting Section 1329. In addition to these general benefits, the Commission also found the transaction would create specific benefits for the Township's current customers, such as enhanced customer service options, reduction in System expenses, capital investments, and Aqua's ability to mitigate sanitary sewer overflows and deal with complex regulations resulting in improved system efficiencies. Commission Op. at 38-42. The Commission also questioned the Township's ability to accomplish the necessary improvements and upgrades to the System that Aqua intended to undertake due to the multitude of other services to which the Township must allocate funds to address other needs of its citizens. *Id.* at 40.

In accordance with *City of York*, the Commission also addressed the acquisition's impact on rates. It discussed the revenue deficiency that would result from the transaction and the impact that deficiency would have on the Township's customers. Ultimately, however, the Commission found the revenue deficiency was only a preliminary calculation that was unlikely to be allocated one hundred percent to the Township's customers. *Id.* at 43. The Commission did acknowledge that some level of rate increase was expected upon approval of the transaction, but it also observed that a rate increase was likely even if it denied the acquisition due to the level of capital expenditures considered to be necessary over the next ten years. *Id.* at 44. Altogether, the Commission concluded that "if the transaction is approved, there will be more flexibility to address rate impact and to allocate costs over a much larger customer base." *Id*.

> Based on its analysis, the Commission concluded:

> When considering all the factors, including the impact on rates, we find that the benefits of Aqua's ownership outweigh the purported harms outlined by the OCA. Aqua's expertise and ability to raise and deploy capital and to spread costs over a larger customer base, the Township's decision to exit the wastewater business, and the transaction's furtherance of the policy objectives of the General Assembly in enacting Section 1329, as well as the additional factors discussed above, are all substantial affirmative benefits weighing in favor of granting the [CPC].

*Id.* The Commission thus approved the application and granted Aqua a CPC, reducing the ratemaking base rate to $54,413,635.00. The OCA petitioned the Commonwealth Court for review, arguing the Commission erred as a matter of law and abused its discretion when it approved Aqua's application.

## C. Commonwealth Court Opinion

In a published opinion, a panel of the Commonwealth Court reversed the Commission's decision. *Cicero v. Pa. Pub. Util. Comm'n*, 300 A.3d 1106 (Pa. Cmwlth. 2023). The panel began its analysis by acknowledging that in reviewing a decision of the Commission to grant a CPC, it "bear[s] in mind that, on account of the Commission's

expertise in the utility arena, reviewing courts accord considerable deference to the agency concerning the certification process." *Id.* at 1118 (quoting *Popowsky*, 937 A.2d at 1054). Accordingly, the panel continued, the issuance of a CPC "falls squarely within the Commission's area of expertise and is best left to the Commission's discretion." *Id.* (brackets removed) (quoting *Elite Industries, Inc. v. Pa. Pub. Util. Comm'n*, 832 A.2d 428, 432 (Pa. 2003)). The panel observed, however, that "such discretion is not absolute, and 'where the judgment is manifestly unreasonable or where the law is not applied' that discretion is abused." *Id.* (emphasis removed) (quoting *Commonwealth v. King*, 839 A.2d 237, 240 (Pa. 2003)).

With that standard of review in mind, the panel first considered the OCA's argument that the Commission erred by limiting its affirmative public benefits analysis to Aqua's technical, managerial, and financial fitness and the Commission's policy promoting consolidation and regionalization. The court rejected the argument from the Commission, the Township, and Aqua that the Commission cited additional benefits of the transaction beyond Aqua's fitness to provide services and the Commission's regionalization policy. According to the court, all the cited additional benefits "derive [ ] from Aqua's size and associated technical, managerial, and financial fitness, and will be present in any acquisition by Aqua (or similarly large utility) of a smaller utility, and not from Aqua's acquisition of the System specifically." *Id.* In the court's view, a public utility's fitness to provide services is distinct from whether a transaction will result in affirmative public benefits.

The court continued that "[t]he financial, technical, and managerial 'benefits' the Commission concluded could result from this transaction relate to and/or are not benefits that 'affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way[ ]" because "the System is already providing and is capable

of providing the same or similar benefits without the acknowledged rate increase that will occur as a result of the acquisition." *Id.* at 1119 (emphasis removed) (quoting *City of York*, 295 A.2d at 828). In support of this conclusion, the panel explained:

> Aqua's ability to provide enhanced customer service, such as a toll-free line that is available 24/7/365, and in-house engineers, experts, and a laboratory, is because it is a large, technically fit utility. Moreover, the System already provides customer service, 24/7/365, even if part of that service requires calls to the police after hours, and there is no evidence the System lacks the ability to provide safe and reliable service due to its lack of in-house capabilities. While Aqua has committed to spend $16.92 million for capital improvements, which it can guarantee due to its size and financial fitness, [the] Township is likewise capable, and has the funds on hand, to complete the needed improvements and upgrades, without the financial burden of funding Aqua's purchase. Finally, although [the] Township would receive funds from the sale, which could be used for other governmental purposes, those funds are available because the System's customers, and potentially Aqua's current customers, will bear the burden of the costs of that acquisition.

*Id.* According to the panel, "[h]olding that these services and upgrades that are the result of the acquiring utility's size and fitness are substantial affirmative public benefits is not consistent with *City of York* and its progeny." *Id.*

The panel further held that an acquiring utility's ability to provide the same services already provided by the selling utility does not constitute a benefit at all, let alone a substantial affirmative public one as required by the caselaw. *Id.* In the panel's view, this is especially true where, as here, the selling utility is already operating safely and reliably. Citing *Popowsky*, the panel explained that the affirmative public benefit test is a "net benefit assessment." *Id.* (quoting *Popowsky*, 937 A.2d at 1056). Accordingly, it explained that "[w]here, as here, there are no benefits that differ substantially from the benefits already being provided by the existing system operator, those alleged benefits arise as a result of the acquiring utility's fitness, rather than from the actual transaction, and where there are acknowledged or known harms that will result from the transaction, there are insufficient net benefits to support approving the transaction and granting the CPC under

Section 1103(a)." *Id.* (emphasis removed). The "acknowledged or known harms" refers to the potential rate increases that would result from the transaction.

Continuing, the panel recognized that this Court has held that the Commission is not required to obtain legally binding commitments from acquiring utilities and that "aspirational statements" are substantive evidence of an affirmative public benefit. *Id.* (citing *Popowsky*, 937 A.2d at 1055-57 and n.18; *City of York*, 295 A.2d at 829-30; and *McCloskey,* 195 A.3d at 1065-66). Moreover, it recognized that while *McCloskey* held that "aspirational statements regarding the expertise and the ability to raise capital of an acquiring utility could constitute substantial evidence of a public benefit of a merger, [the court] did not reach the issue of whether such benefits would outweigh the known harms of increased rates to the customers because the Commission did not consider the evidence of that harm." *Id.* at 1120 (emphasis removed) (citing *McCloskey*, 195 A.3d at 1065-66). The court insisted, however, that those aspirational statements must be considered in the context of the particular facts of the case and the public benefit arising from aspirational statements will not always constitute affirmative public benefits that will be substantial enough to outweigh known harms, such as anticipated rate increases.

Lastly, the panel concluded that nothing in Section 1329 or its decision in *McCloskey* altered the requirements to obtain a CPC set forth in Sections 1102 and 1103. Therefore, according to the panel, in every Section 1329 transaction, it must be shown that the affirmative public benefits of the transaction outweigh the harms of the transaction "such that approval of the transaction will 'affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way.'" *Id.* (emphasis removed) (quoting *City of York*, 295 A.2d at 828). In the panel's view, Aqua failed to meet this burden and the Commission "erred and/or abused its discretion" in concluding otherwise. *Id.* As such, the court reversed the Commission's grant of a CPC

to Aqua. Based on its resolution of that issue, the panel did not address the OCA's additional argument that the Commission's findings of fact were not supported by substantial evidence.

The Commission, the Township, and Aqua (collectively "Appellants") separately filed individual applications for reargument, which the court denied. Subsequently, Appellants each individually filed separate petitions for allowance of appeal with this Court. We granted Appellants' respective petitions and consolidated the appeals. *Cicero v. Pa. Pub. Util. Comm'n*, 320 A.3d 667 (*per curiam*).

## II. Arguments of the Parties

### A. The Commission's Argument

The Commission begins by arguing the Commonwealth Court failed to give proper deference to the Commission's interpretation of Sections 1102, 1103, and 1329. According to the Commission, its expert interpretation of utility law is entitled to great deference in administering the statute for which it has enforcement responsibility, and its determinations should not be reversed unless those determinations are clearly erroneous. Commission's Brief at 16 (citing *Popowsky v. Pa. Pub. Util. Comm'n.*, 706 A.2d 1197 (Pa. 1997)). Further, the Commission insists an appellate court should not substitute its discretion for that properly exercised by the Commission. *Id.* at 15-17, n.45 (citing *Rohrbaugh v. Pa. Pub. Util. Comm'n.*, 727 A.2d 1080, 1085 (Pa. 1999)). In the Commission's view, that is exactly what occurred in the Commonwealth Court below.

The Commission avers that, guided by the statutory requirements of the Code and the clarifying caselaw, it thoroughly evaluated all factors for and against the transaction, including evidence of potential rate impacts, Aqua's technical and financial fitness to provide service to the System's customers, and public policy interests of regionalization and consolidation. As to rate impacts, the Commission insists it explicitly

reiterated its obligation to consider the rate impacts of the transaction. It further noted that rate increases are typical with capital expenditures and, due to the System's need for capital improvements, that rate increases were likely whether it approved the transaction or not. The Commission argues *McCloskey* supports its position that an acquiring utility's technical and financial fitness can be considered in determining if a transaction satisfies the affirmative public benefits test to grant a CPC. *Id.* at 20 (citing *McCloskey*, 195 A.3d at 1065). *McCloskey* also supports, according to the Commission, the proposition that its public policy of consolidation and regionalization are sufficient to meet Section 1103's affirmative benefits standard. *Id.* (citing *McCloskey*, 195 A.3d at 1065). That being the case, the Commission insists it did not merely rely on the public policy of consolidation and regionalization, but cited the benefits of that public policy, including lower operating costs, significant System upgrades, dedicated customer services, enhanced billing practices, increased maintenance upgrades, and expansion of public water and sewer facilities.

According to the Commission, by disregarding its interpretation of the applicable law, the Commonwealth Court erroneously determined that any potential rate increase should factor more heavily into the balancing tests of Sections 1102 and 1103. The Commission further contends the Commonwealth Court ignored the record evidence cited by the Commission and independently created the court's own standard for approval of Section 1329 transactions, which contradicts the plain language of the Code. In the Commission's view, the court's focus on the condition of the System was misplaced because Section 1329 does not contain any express or specific language regarding the condition of a selling utility. Additionally, the court's elevation of the potential rate impact above all other considerations also contravenes the statute, as Section 1329 by its very nature of setting an acquiring utility's rate base at the FMV contemplates the possibility

of rate increases. In total, the Commission argues that by substituting its discretion for that of the Commission and altering the plain language of Section 1329, the Commonwealth Court created a new standard that deters Section 1329 transactions at a detriment to the public.

Next, the Commission argues it is required to weigh all the factors for and against a transaction, including the impact on rates, to determine if there is a substantial public benefit. In the Commission's view, it satisfied this requirement by weighing the factors, including evidence of the potential impact on rates, Aqua's technical and financial fitness to provide service, and the public policy interest of regionalization and consolidation. It then concluded that the transaction resulted in substantial affirmative public benefits that outweighed the purported harms. The Commission contends the Commonwealth Court committed an error of law by rejecting the Commission's evidentiary findings and instead reweighing the evidence in order to incorrectly hold that no affirmative public benefits existed as a result of Aqua's acquisition of the System.

The Commission next asserts that, in explicitly stating that there are no benefits that differ substantially from the benefits already being provided by the Township, the Commonwealth Court mistakenly established a new legal standard that disregards established precedent and signaled that, unless a municipally owned utility is nonviable or the FMV transaction will improbably not negatively impact rates, the Commission is no longer permitted to find that a Section 1329 transaction provides a substantial public benefit. As such, the Commission argues that by ignoring its evidentiary findings, the lower court has usurped the Commission's fact-finding role and precluded certain municipalities from exiting the service market by choice. Further, the Commission argues

that, by framing the transaction's potential impact on rates as a "known harm"[8] and determining the characteristics relating to Aqua's fitness to provide service could not be considered benefits of the transaction, the Commonwealth Court ignored the settled precedent of *City of York*, *Popowsky*, and *McCloskey*, and created a new "net benefits" test. In so doing, the Commission asserts that the lower court contravened the clear intent of the General Assembly in enacting Section 1329, which the Commission posits was to further the public policy goals of regionalization and consolidation by encouraging the sale of municipally owned water and wastewater systems to investor-owned public utilities.

## B. The Township's Arguments

For its part, the Township first argues the Commonwealth Court erred in holding that the Commission wrongly granted Aqua a CPC because the Township was providing adequate services and Aqua would not provide anything the Township was not already providing. The Township insists this holding contravenes the unambiguous language of Section 1103 because it essentially bars the grant of a CPC unless the transaction is necessary, rendering meaningless the statute's directive that the Commission can grant a CPC if such action would serve a "proper" purpose. According to the Township, a public utility is entitled to a CPC if it proves by a preponderance of the evidence that the transaction is "necessary or proper for the service, accommodation, convenience, or safety of the public." Township's Brief at 38 (quoting 66 Pa.C.S. § 1103(a)). In its view, a reasonable interpretation of that language requires the Court to give separate meaning

---

[8] The Commission rejects the description of a potential rate increase as a "known harm" and instead frames it as "a non-binding estimate of the incremental rate effect [that] is used as part of the notice procedure to customers in Section 1329 proceedings." Commission's Brief at 37 (quoting PUC Order, 7/29/22, at 43). Further, the Commission argues rate increases should not be considered known harms, as all Section 1329 transactions will result in rate increases because the statute permits the acquiring utility to include the costs of the transaction in its base rate.

to the terms "necessary" and "proper," and neither *City of York* nor its progeny altered that statutory language. Citing definitions from Merriam-Webster's and Black's Law dictionaries, the Township defines "proper" in the context of Section 1103 to mean suitable, right, or appropriate but not necessary. *Id*. at 43-44. The Township insists its interpretation is in line with our decision in *Elite Industries*, where the Township contends, we held that the General Assembly's use of the phrase "or proper" evidenced its intent to allow expanded service even where such service was not necessary for the public. *Id*. at 39 (citing *Elite Industries*, 832 A.2d at 431). Additionally, the Township argues the fact the legislature left the phrase undefined signaled its desire to leave the formulation of the criteria to satisfy the "necessary or proper" requirement in the discretion of the Commission. *Id.* (citing *Elite Industries*, 832 A.2d at 431). Further, according to the Township, this interpretation harmonizes Section 1329, which does not contain a necessity requirement, with Section 1327, which does contain such a requirement.

As to the transaction's propriety, the Township contends there were at least three proper purposes: (1) for the Township to dedicate more time and resources to its core governmental functions by exiting the wastewater business before the System began deteriorating or falling into crisis; (2) for the Township to use the potential sale proceeds to address other equally critical Township purposes; and (3) to promote regionalization and consolidation of wastewater utilities, given that Aqua already owned and operated the Township's water system as well as other water systems within a close geographical proximity to the System. Consequently, the Commission correctly granted Aqua a CPC pursuant to Section 1103's "or proper" language.

The Township further insists the Commonwealth Court erred by holding that the Commission could not consider benefits related to Aqua's size and fitness as legal benefits in its affirmative public benefits analysis. According to the Township, and

contrary to the lower court's holding, the question of whether something is an affirmative public benefit is a question of fact to be reviewed by an appellate court for support by substantial record evidence, rather than a question of law to be reviewed *de novo*. *Id.* at 51 (citing *Popowsky*, 937 A.2d at 1048-50 (characterizing "public benefits" as a "finding" rather than a "holding" or "legal conclusion")). Despite this clear standard, the Township maintains the lower court treated the Commission's affirmative public benefits factual findings as legal conclusions when it stated that the benefits the Commission found and credited could not constitute benefits as a matter of law.

To the extent the court was required to review the Commission's factual findings of the transaction's benefits, the Township contends that that review was limited to determining if those findings were supported by substantial record evidence. To this end, the Township further argues that not only were the Commission's findings supported by substantial evidence, but each of the benefits credited by the Commission is a benefit that differs from those already offered by the Township, contrary to the lower court's assertion. Additionally, and again contrary to the Commonwealth Court's conclusion, the Township insists that the Commission found benefits related to the transaction itself rather than merely related to Aqua's size and fitness, including that the transaction (1) supported regionalization and consolidation by allowing Aqua to consolidate its operations of the Township's water and wastewater systems in a manner that could enhance operational efficiency, (2) could achieve economies of scale, and (3) would allow the Township to exit the sanitary sewer business so as to focus its resources on other core government functions while ensuring safe, reliable services at affordable rates to its residents. *See id.* at 57-58. The Township insists none of these benefits relate at all to Aqua's size or fitness, let alone do so exclusively. Importantly, the Township argues the fact that some

of the benefits are a byproduct of Aqua's size and fitness does not diminish the fact that they are still benefits of the specific transaction.

Lastly, the Township avers the Commission properly considered the potential rate impact of the transaction. In the Township's view, appellate courts are permitted to review the record only to determine if the Commission considered the impact on rates in a "general manner," in accordance with *City of York*. Here, the Township insists the record clearly supports the conclusion that the Commission did, in fact, consider the transaction's rate impact. The Commonwealth Court, however, overstepped its limited role by finding the Commission failed to give enough weight to the transaction's potential rate impact, a fact the Township forcefully contends violates this Court's directives in *City of York* and *Popowsky*.

### C. Aqua's Arguments

Aqua first contends the lower court's decision violates established judicial standards of review and nullifies the careful legislative policy and terms of Section 1329. In its view, the court's order effectively prevents the Commission from approving transactions that are in the public interest by holding that a utility purchaser of municipal utility assets is not entitled to a CPC under Section 1103 and a rate base determination under and in accordance with Section 1329, even though the utility has proven – as found by the Commission – that the request was necessary or proper for the service, accommodation, convenience or safety of the public. According to Aqua, the Commission's evidentiary standard in granting a CPC is a preponderance of the evidence, which only requires that one party has presented evidence that is more convincing, by even the smallest amount, than the evidence presented by the other party. Aqua's Brief at 32 (citing *Energy Conservation Council of Pa. v. Pa. Pub. Util. Comm'n*, 995 A.2d 465, 478 (Pa. Cmwlth. 2010)). Utilizing this standard, Aqua insists the

Commission properly found that Aqua had met its burden in support of a CPC under Section 1103 and the requested base rate determination under Section 1329. Moreover, Aqua contends the Commonwealth Court's scope of review in these types of matters is limited to determining: (1) whether a constitutional violation or error in procedure has occurred; (2) whether the decision is in accordance with the law; and (3) whether the necessary findings are supported by substantial evidence. *Id.* at 31 (citing *PECO Energy Co. v. Pa. Pub. Util. Comm'n*, 791 A.2d 1155, 1160 (Pa. 2002)). Aqua insists the Commonwealth Court violated its scope of review by second guessing the Commission and reweighing the evidence the Commission found in support of the CPC, removing certain facts (*i.e.,* benefits associated with Aqua's size and the Commission's policy supporting consolidation and regionalization), and unlawfully finding that the potential rate increase associated with the FMV rate base determination under Section 1329 constituted a known harm that must be weighed against a slate of benefits the court unilaterally limited.

Aqua acknowledges that the Commonwealth Court may also review the Commission's decisions for an abuse of discretion but asserts that standard is extremely difficult to meet. Under Aqua's interpretation, the Commission only abuses its discretion "where a judgment is manifestly unreasonable or is the result of partiality, prejudice, bias or ill-will as shown by the record." *Id.* at 33 (quoting *S. River Power Partners, L.P. v. Pa. Pub. Util. Comm'n*, 696 A.2d 926, 932 n.8 (Pa. Cmwlth. 1997)). According to Aqua, the Commonwealth Court's opinion in no way satisfies the substantial and heavy burden imposed on it to support a finding that the Commission abused its discretion in the grant of the CPC to Aqua here, especially in light of the fact that the Commission followed and applied existing and settled law applicable to Section 1103. Further, Aqua insists the court was required to defer to the Commission since the Commission is the agency

charged with the administration of the scheme of public utility regulation with specialized expertise in this arena. As such, the Commission's judgments concerning weight and balancing of associated policy considerations connected with utility certification are also entitled to the court's considerable deference. *Id.* at 35 (citing *Popowsky*, 937 A.2d at 1059).

In its review of the Commission's determination, Aqua contends the Commonwealth Court is prohibited from reweighing the evidence considered by the Commission, including both the weight given to individual benefits of the transaction as well as the weight of the benefits and harms of the transaction in the aggregate. In its view, rather than examining if the record before the Commission contained the substantial evidence the Commission relied on, the court instead removed evidence of affirmative benefits from one side of the evidentiary scale and added what it called "known harms," *i.e.*, potential rate increases, to the other side of the scale. In removing the benefits that derive from Aqua's size and associated technical, managerial, and financial fitness, Aqua asserts the Commonwealth Court established a new legal standard not previously recognized by any court or known to the Commission. Aqua stresses that there is no basis in fact or law for the Commonwealth Court unilaterally declaring that certain kinds of benefits should be ignored or are less of a benefit than other benefits associated with the transaction. Aqua continues that in so doing the court completely disregarded specific benefits of the transaction noted by the Commission that were expected to improve the quality of services provided by the System, such as better emergency coverage and availability of certified system operators; commitment to capital expenditures; pursuit of safety and infiltration and inflow services; reduction of system expense levels; along with benefits to the Township, including the influx of funds to be used on other core government services.

Additionally, Aqua argues the lower court erred by characterizing the potential rate increases resulting from the transaction as a "known harm." In this regard, Aqua believes potential rate impacts are the expected result of Section 1329 transactions. Moreover, Aqua observes that no rate increases were set during the CPC process, and it agreed to continue the rates currently used by the System. Further, while under our caselaw the general impacts of a transaction on rates can and should be considered in the affirmative benefits test, it is inappropriate to characterize the estimated rate impact as a known harm, especially when Section 1329 specifically establishes a process where the assets to be acquired are included in the rate base of a FMV higher than original depreciated costs and used for rate setting purposes.

Altogether, Aqua insists that the Commonwealth Court's opinion contravenes *City of York*, *Popowski*, and *McCloskey*; violates the precepts of statutory construction; disincentivizes Section 1329 transactions; and will result in such transactions not occurring until municipal-owned water and wastewater utilities are no longer capable of providing adequate services to their customers.[9]

### D. OCA Argument

The OCA counters that the Commonwealth Court correctly determined that the Commission erred as a matter of law and abused its discretion in its failure to apply the proper legal standard under Sections 1102 and 1103 to the specific facts of this case. According to the OCA, the Commission conflated Aqua's fitness to own and operate the System with a net benefit of the transaction despite the fact that the Commission found

---

[9] The National Association of Water Companies and the National Association of Water Companies – Pennsylvania Chapter filed a joint *amicus curiae* brief on behalf of Appellants. The Pennsylvania Chamber of Business and Industry and the Chester County Chamber of Commerce filed a joint *amicus curiae* brief in support of the Township and Aqua. The Pennsylvania State Association of Township Supervisors and the International Municipal Lawyers Association filed a joint *amicus curiae* brief in support of the Township.

that the Township was also fit to provide the same or similar services without the acknowledged rate harm. In light of this error, the OCA insists the Commonwealth Court correctly determined that none of the asserted benefits related to fitness and services as articulated by Aqua and the Township were actual benefits. Rather, those asserted benefits amounted to nothing other than the status quo for customers. Despite this status quo, the OCA argues that Aqua's acquisition of the System would come at a steep financial cost in the form of future rate increases for consumers. The OCA argues this outcome could only lead to the legal conclusion that there were no substantial affirmative public benefits resulting from the transaction.

Further, the OCA insists the Commission's decision was not entitled to any deference because it abused its discretion by failing to apply the proper legal standard to the facts. OCA's Brief at 13 (citing *King*, 839 A.2d at 240). In this regard, the OCA argues that, in determining whether any benefits existed, the Commonwealth Court properly examined the facts as presented, including the status quo of Aqua and the Township as potential and existing operators of the System, and the acknowledged rate increase that would occur as a result of Aqua's acquisition. According to the OCA, by applying the proper net benefits standard, the lower court correctly concluded that where there are no benefits that differ substantially from the benefits already being provided by the existing system operator, any alleged benefits arising as a result of the acquiring utility's fitness, rather than from the specific transaction, are insufficient to support a finding that the transaction provides substantial affirmative public benefits and thus, are insufficient to grant a CPC.

Contrary to Appellants' arguments, the OCA insists the Commonwealth Court did not reweigh the evidence because the court relied on the Commission's factual findings. However, in the OCA's view, the Commonwealth Court, unlike the Commission, correctly

applied those facts to the existing legal standard to determine what legally constitutes substantial affirmative public benefits. In so doing, the OCA contends the court relied on the weight given to the evidence by the Commission regarding the condition of the System, existing service quality, and the fitness of both the existing and potential operators and determined that the benefits pointed to by the Commission legally could not be considered benefits because they amounted to nothing more than a perpetuation of the status quo. Per the OCA, this is not reweighing the evidence but, rather, it is an application of controlling law to the facts as found by the Commission. As such, the OCA contends that the Commonwealth Court, in effect, made clear that the Commission's analysis under Sections 1102 and 1103 cannot end with the determination of the buyer's fitness because that will not fully address the necessary question of whether there are substantial affirmative benefits from the proposed transaction. Under the Commission's approach, the OCA argues, a utility's fitness would subsume the affirmative public benefits test.

Additionally, the OCA contends that the Commission mistakenly relied on its own policy statement on regionalization and consolidation to find affirmative public benefits. The OCA maintains caselaw is clear that Commission policy cannot substitute for evidence. *Id.* at 22 (citing *Aizen v. Pa. Pub. Util. Comm'n*, 60 A.2d 443, 449 (Pa. Super. 1948)). The OCA further argues that the Commission's finding that regionalization and consolidation are a policy objective of the General Assembly in enacting Section 1329 is not due any deference because the finding is not a reasonable interpretation of the statute. In the OCA's view, Section 1329 does not identify any policy objective but instead merely creates a valuation procedure for municipal water and wastewater acquisitions.

As to the rate impact of the transaction, contrary to Appellants' characterizations, the OCA asserts that an increase in rates is more than probable as it is instead a known

and measurable certainty as fully supported by the record. Specifically, the OCA insists it is undisputed that there will be a $5.011 million annual shortfall between current rates and what Aqua would need to charge in order to pay its full cost of service after acquisition. Likewise, that revenue requirement will be higher in rate cases going forward due to normal capital expenditures that Aqua committed to spend over the next ten years. While the OCA acknowledges there may be future rate increases even if the Township retains ownership of the System, it argues the increases under Aqua will be higher due to higher debt costs, the return on Aqua's investment (*i.e.*, Aqua's profit), and taxes that are present for investor-owned utilities. It is true that how those increases will be allocated among Aqua's customers may be unknown, but the OCA insists that not knowing which customers will bear the burden of the harm does not negate the existence of that harm. The OCA also rejects the argument that rate increases cannot be a harm because they are contemplated by Section 1329, which was enacted by the legislature. If this argument was correct, the OCA contends that rate impact could never be considered a harm in a Section 1102 and 1103 analysis so long as the utility property is valued as permitted by the Code, which it asserts would be a sea change in a CPC analysis not contemplated by Section 1329.

Altogether, the OCA argues that the Commonwealth Court's decision is in line with existing precedent, including *City of York, Popowsky,* and *McCloskey*, and the plain language of Section 1329. The OCA further argues Appellants' hyperbole regarding the impact of the decision should be disregarded because it is an extension of their failed statutory construction arguments. Thus, the OCA asks the Court to affirm the Commonwealth Court's holding.[10]

---

[10] The Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania and Pennsylvania Municipal Authorities Association filed separate *amicus curiae* briefs in support of the OCA.

## III. Discussion

Initially, as observed above, we have not previously reviewed a CPC determination by the Commission as part of a Section 1329 transaction. As such, we must first address the Commonwealth Court's determination that nothing in Section 1329 altered the requirements to obtain a CPC set forth in Sections 1102 and 1103 and that our holdings in *City of York* and *Popowsky* are applicable to Section 1329 transactions. *See Cicero*, 300 A.3d at 1120; *see also McCloskey*, 195 A.3d at 1064-67 (applying *City of York* and *Popowsky* to a 1329 transaction).

A review of Section 1329's plain language reveals that the provision does not mention Section 1103 at all. It also only references Section 1102 to address what information must be contained in an 1102 application, *see* 66 Pa.C.S. § 1329(d)(1) and (e), and who qualifies as an "entity." *See id*. at § 1329(g) (defining "Entity"). These minor references to Section 1102 cannot reasonably be read as the General Assembly making any substantive changes to Section 1102's requirements of when a CPC is required. Rather, these references are consistent with the proposition that the legislature was merely directing that Section 1329 transactions are required to comply with existing Section 1102 procedures and requirements. Further, Section 1329's complete silence as to Section 1103, which sets out the procedures for obtaining a CPC, indicates the General Assembly's intent to apply Section 1103's existing requirements, including our precedent interpreting the section, to Section 1329 transactions. We, therefore, concur with the Commonwealth Court that Section 1329 did not alter the requirements of Sections 1102 and 1103 and our precedent interpreting those requirements is applicable to Section 1329 transactions.

Pursuant to Section 1103(a), the Commission shall grant a CPC "only if [it] shall find or determine that the granting of such certificate is necessary or proper for the

service, accommodation, convenience, or safety of the public." 66 Pa.C.S. § 1103(a). In *City of York*, addressing Section 1103's predecessor and reversing prior precedent, we held that the statute's "unequivocal command" was that a "utility merger is not to be approved unless the Commission is able to find that the merger will affirmatively benefit the public[.]" *City of York*, 295 A.2d at 828. Therefore, in order to obtain a CPC, proponents of the merger had to "demonstrate that the merger will affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way." *Id.* (internal quotation marks removed). In conducting this inquiry, the Commission "is not required to secure legally binding commitments or to quantify benefits where this may be impractical, burdensome, or impossible; rather the [Commission] properly applies a preponderance of the evidence standard to make factually-based determinations (including predictive ones informed by expert judgment) concerning certification matters." *Popowsky*, 937 A.2d at 1057. Moreover, the Commission is not required to find an absolute public necessity in order to grant a CPC, as that would ignore the General Assembly's inclusion of the phrase "or proper" in the statute. *Elite Industries*, 832 A.2d at 431.

In engaging in this affirmative public benefit analysis, the Commission is required to consider the impact that granting the CPC would have on rates. In *City of York,* we stated "the Commission should consider, at least in a general fashion, the effect that a proposed merger is likely to have on future rates to customers. Along with the likely effect of a proposed merger upon the service that will be rendered to consumers, the probable general effect of the merger upon rates is certainly relevant criteria of whether the merger will benefit the public." *City of York*, 295 A.2d at 829. As such, the Commission cannot postpone considering the impact on rates until a future rate base case but, rather, must consider the impact on rates as part of its affirmative public benefits analysis. *McCloskey*,

195 A.3d at 1066.  This consideration may include the rate impact on both existing and new consumers.  *Id.* at 1067.  However, the grant of a CPC does not benefit the public "*only* if the [Commission] demonstrate[s] that the [transaction's] savings will lower prices to consumers."  *Popowsky*, 937 A.2d at 1056 (emphasis in original).

As to the review of the Commission's decision to grant or deny a CPC, appellate review of the Commission's determination is generally

> limited to determining whether a constitutional violation, an error of law, or a violation of procedure has occurred and whether the necessary findings of fact are supported by substantial evidence. … Substantial evidence has been defined as the amount of relevant evidence which a reasonable person would accept as adequate to support a determination.  We also bear in mind that, on account of the Commission's experience in the utility arena, reviewing courts accord considerable deference to the agency concerning the certification process.

*Popowsky*, 937 A.2d at 1054 (citations and footnote removed); *see also* 2 Pa.C.S. § 704. Additionally, when "evaluating the 'reasonableness' of any discretionary agency action, appellate courts accord deference to agencies and reverse agency determinations only if they were made in bad faith or if they constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions."  *Rohrbaugh*, 727 A.2d at 1085 (citing *Slawek v. State Bd. of Med. Educ. & Licensure*, 586 A.2d 362, 365 (Pa. 1991)).  Moreover, in the absence of this type of abuse of discretion, appellate courts "will not inquire into the wisdom of such action or into the details of the manner adopted to carry them into execution."  *Slawek*, 586 A.2d at 365.

Here, the Commission determined Aqua demonstrated that the transaction provided "substantial affirmative public benefits that outweigh[ed] the purported harms asserted by the OCA."  Commission Op. at 29.  In support of this determination, the Commission cited Aqua's financial, technical, and managerial expertise to be the certificated provider of the System and that the transaction would further the Commission's policy of regionalization and consolidation as benefits of the transaction.

In addition to these more general benefits, the Commission also found that the transaction would result in specific benefits arising out of Aqua's acquisition of the System. The Commission found the transaction would benefit Aqua's existing customers in multiple ways, including by increasing the company's customer base, resulting in future infrastructure projects being shared at a lower incremental cost per customer. *Id.* at 36-37.

The Commission also identified numerous benefits to the System's current customers, including (1) a reduction in the System's operating expenses; (2) investment in capital improvements; (3) mitigation of sanitary sewer overflows; (4) Aqua's ability to deal with complex environmental regulations and improve system efficiencies; and (5) a variety of customer service and customer billing and payment protection enhancements. *Id.* at 38-42. Moreover, the Commission determined the record was unclear whether the Township would be able to make the necessary improvements and upgrades to the System that Aqua proposed due to the multitude of other services the Township must allocate funds to in order to address the needs of its citizens. *Id.* at 40. An additional public benefit was the Township's desire to sell the System and exit the wastewater business. *Id.* at 42-43.

In addition to the above identified benefits, the Commission also considered the impact of the transaction on customer rates:

> All of the [p]arties acknowledge that some level of rate increase is expected as a result of the transaction. Indeed, there is a reasonable expectation that rates for the Township's customers will increase even if the Commission were to reject the [a]pplication given the level of capital expenditures considered to be necessary over the next ten years. However, we agree with Aqua and the Township that, if the transaction is approved, there will be more flexibility to address rate impact and to allocate costs over a much larger customer base.

*Id.* at 44 (citations removed). In light of all these findings, the Commission concluded:

When considering all the factors, including the impact on rates, . . . the benefits of Aqua's ownership outweigh the purported harms outlined by the OCA. Aqua's expertise and ability to raise and deploy capital and to spread costs over a large customer base, the Township's decision to exit the wastewater business, and the transaction's furtherance of the policy objectives of the General Assembly in enacting Section 1329 . . . are all substantial affirmative benefits weighing in favor of granting the [a]pplication.

*Id.*

Upon review, however, the Commonwealth Court agreed with the OCA that the Commission erred by considering characteristics related to Aqua's size along with its technical, managerial, and financial fitness in the Commission's affirmative benefits analysis. *Cicero*, 300 A.3d at 1118. According to the court, "a determination that a utility is fit to provide the proposed service is separate from the determination that the transaction will result in affirmative public benefits that outweigh the harm thereof." *Id.* Additionally, the court found that to hold benefits "that are the result of the acquiring utility's size and fitness are substantial affirmative public benefits is not consistent with *City of York* and its progeny." *Id.* at 1119. The court is correct that a transaction does not satisfy the affirmative public benefits test merely because the acquiring utility is legally, technically, and financially fit to provide the proposed services. That indisputable position, however, does not necessarily lead to the conclusion that the Commission is barred from considering benefits emanating from that fitness in its affirmative public benefits analysis.

Neither Sections 1102 and 1103 of the Code nor *City of York* and its progeny support the Commonwealth Court's conclusion that the Commission's affirmative benefits analysis is limited in this manner. To the contrary, as we have previously stated, the General Assembly has "provided no definition of specifically what the criteria were to be in determining the propriety of granting a [CPC], leaving the formulation of such criteria to the [Commission]." *Elite Industries*, 832 A.2d at 432; *see also Seaboard Tank Lines,*

602 A.2d at 764-65 (Pa. Cmwlth. 1985) (same). As such, it is for the Commission in the first instance, and not the courts, to determine what constitutes a benefit. Merely because certain benefits of a transaction derive from the acquiring utility's fitness to provide the proposed service does not automatically bar the Commission from considering those benefits in its affirmative benefits analysis. This position is in line with our reasoning in *Popowsky* addressing the Commission's consideration of the results of federal investigations and accords in its affirmative benefits analysis. In that instance, we "disapprove[d] the notion that the Commission should be foreclosed from accepting the noted advantages as benefits pertaining in the Commonwealth on a developed Pennsylvania-specific record merely because they also pertain nationally." *Popowsky*, 937 A.2d at 1061. We likewise disapprove of the notion that the Commission is foreclosed from considering benefits of a transaction merely because those benefits also pertain to the acquiring utility's fitness. We emphasize that an acquiring utility's size and fitness are not benefits in and of themselves but, rather, simply hold that the Commission can properly consider benefits deriving from that size and fitness in its affirmative benefits analysis.

Moreover, the Commonwealth Court found the benefits identified by the Commission could not actually constitute benefits because the System was "already providing and [was] capable of providing the same or similar benefits without the acknowledged rate increase that will occur as a result of the acquisition." *Cicero*, 300 A.3d at 1119. The Commission, however, determined that Aqua would, in fact, be able to provide services the Township was not providing, including twenty-four-hour customer service, online bill payment options, and in-house engineers and environmental compliance experts. Commission Op. at 40-41. Instead of reviewing the record to determine if the Commission's factual findings related to these benefits were supported

by substantial evidence, the Commonwealth Court instead merely found that, in its view, "the System already provides customer service 24/7/365, even if part of that service requires calls to the police after hours, and there is no evidence the System lacks the ability to provide safe and reliable service due to its lack of in-house capabilities." *Cicero*, 300 A.3d at 1119. The court, while acknowledging the differences between the services currently provided by the Township and what would be provided by Aqua, essentially held that the benefits found by the Commission were insufficient to satisfy the substantial affirmative benefits test. The extent to which the services Aqua could provide would be an improvement over the services the Township currently provides goes to the weight accorded to those particular benefits rather than whether or not the services qualify as benefits at all. The court's disagreement with the Commission's determination that Aqua's services constituted benefits was, therefore, a reweighing of the evidence. By reweighing the evidence in that manner, the court replaced the Commission's consideration of the evidence of record with its own. That reweighing violated the considerable deference reviewing courts are to accord to the Commission concerning its certification decisions. *See Popowsky*, 937 A.2d at 1054.[11]

That the court would have come to a different conclusion regarding the value of these benefits is of no moment, as "a different opinion or judgment in regard to the action

---

[11] The Commission also found the transaction provided affirmative public benefits because it furthered the Commission's policy of regionalization and consolidation of wastewater systems. In *McCloskey*, the Commonwealth Court held the Commission's policy of regionalization and consolidation of water and wastewater systems is "of the type that [this Court] in [*Popowsky*] held were sufficient to meet the Section 1103 public benefit standard." 195 A.3d at 1065. Here, the court held that such "aspirational statements" or benefits will not always satisfy the affirmative benefits test. *Cicero*, 300 A.3d at 1119. We agree with the court on both accounts. The Commission's policy on regionalization and consolidation is the type of "aspirational statement" that can be considered a benefit of a transaction under *Popowsky*. However, that policy may not always, alone, be sufficient to satisfy the necessary net benefits test for granting a CPC.

of the agency is not a sufficient ground for interference; judicial discretion may not be substituted for administrative discretion." *Blumenschein v. Hous. Auth. of Pittsburgh*, 109 A.2d 331, 335 (Pa. 1954) (emphasis removed). It is further irrelevant whether the record includes evidence that would support the Commonwealth Court's conclusion that Aqua failed to satisfy the affirmative public benefits test. The question is not how the Commonwealth Court would have ruled in the first instance but only whether there is substantial evidence in the record to support the Commission's findings. *See Wise v. Unemployment Comp. Bd. of Rev.*, 111 A.3d 1256, 1262 (Pa. Cmwlth. 2015). The Commonwealth Court has recognized these principles when it comes to reviewing decisions by the Commission, previously stating "[o]ur duty is to determine only whether or not the PUC's findings are supported by substantial evidence; we may not substitute our judgment for that of the PUC, nor may we indulge in the processes of weighing evidence and resolving conflicting testimony." *Popowsky*, 706 A.2d at 1201 (quoting *Phila. Elec. Co. v. Pa. Pub. Util.* Comm'n, 433 A.2d 620, 624, (Pa. Cmwlth. 1981) (internal quotations and citations omitted)). By holding the transaction would result in zero net benefits simply because it disagreed with the value the Commission assigned to the services Aqua would provide the Township's customers, the Commonwealth Court violated these longstanding precepts.[12]

---

[12] The Commonwealth Court also stated that the "System is already providing and capable of providing the same or similar benefits without the acknowledged rate increase that will occur as a result of the acquisition." *Cicero*, 300 A.3d at 1119 (emphasis removed). The Commission, however, found "there is a reasonable expectation that rates for the Township's customers will increase even if the Commission were to reject the [a]pplication given the level of capital expenditures considered to be necessary over the next ten years." Commission Op. at 44. This finding, which the Commonwealth Court neither acknowledged nor addressed, appears to call into question the court's determination that the Township could provide the same services as Aqua without the rate increase.

Additionally, the Commonwealth Court erred in categorizing the potential rate increase that would result from the transaction as a "known harm." *Cicero*, 300 A.3d at 1119. We have never characterized a transaction's impact on rates as a "known harm" and decline to do so today. Our precedent is clear that a transaction does not only satisfy the affirmative public benefits test if it results in lower rates for consumers. *See Popowsky*, 937 A.2d at 1056 ("[W]e agree [ ] that *City of York* does not hold that a merger benefits the public *only* if the PUC can demonstrate that the merger savings will lower prices to consumers." (emphasis in original)). Rather, a transaction's impact on rates is just one of many factors the Commission is to consider in determining whether a transaction will result in affirmative public benefits. *See id.* (stating a potential rate impact of a transaction is only "a component of a net benefits assessment."). As such, here the Commission was charged with determining whether any negative impact on rates caused by the transaction was outweighed by the positive impacts of Aqua's acquisition so that Aqua's acquisition of the System serves a substantial public benefit. *McCloskey*, 195 A.3d at 1067.

In line with that net benefit assessment requirement, we have not directed the Commission to consider a transaction's impact on rates as a "known harm," but have instead instructed it to consider a transaction's impact on future rates "at least in a general fashion" and that "[a]long with the likely effect of a [transaction] upon the service that will be rendered to consumers, the probable general effect of the [transaction] upon rates is certainly a relevant criteria of whether the [transaction] will benefit the public." *City of York*, 295 A.2d at 829. The Commission complied with that directive here when it considered the transaction's potential impact on the rates paid by both the Township's and Aqua's current customers. The Commission discussed the revenue deficiency that would result from the transaction and the impact that deficiency would have on the

Township's customers if one hundred percent or even fifty percent of the deficiency were to be allocated to them, along with the impact on Aqua's current customers if the rate deficiency was divided between the two groups of customers. Commission Op. at 43. The Commission, however, found that that calculation was only a preliminary analysis of the potential rate impact on the Township's customers and was a non-binding estimate used for the purpose of Section 1329 proceedings. *Id.* In the Commission's analysis, "the Section 1329 valuation could have a highly unlikely rate effect of $0. Equally unlikely is the full allocation of all costs – acquisition and perhaps others – to a rate division consisting of only the customers of the acquired municipal system. The more likely outcome is indeterminate; it will be found somewhere between possible extremes." *Id.* at 43-44 (quotation marks and citation removed).

In addition to considering the likely rate impact if it approved the transaction, the Commission also acknowledged that a rate increase would likely be required even if the transaction was not completed. *Id.* at 44. After this analysis, the Commission concluded that "if the transaction is approved, there will be more flexibility to address rate impact and to allocate costs over a much larger customer base." *Id*. As the Commission's preceding examination clearly indicates, it properly considered the transaction's impact on rates "at least in a general fashion" and as a component of its net substantial affirmative benefits analysis. This is an appropriate rate impact analysis of a Section 1329 transaction. *See McCloskey*, 195 A.3d at 1066-67 (explaining how the Commission could consider a 1329 transaction's impact on rates). The Commission's acknowledgment that it was unable to determine the exact impact the transaction would have on rates does not negate this conclusion. *See Popowsky*, 937 A.2d at 1057 ("In conducting the underlying inquiry, the Commission is not required to secure legally binding commitments or to quantify benefits where this may be impractical, burdensome,

or impossible[.]").  Simply because the Commission came to a different conclusion regarding the transaction's potential impact on rates than the Commonwealth Court and the OCA does not require a conclusion that the Commission failed to properly consider the rate impact in accordance with *City of York* and *Popowsky*.

In the end, the Commission determined substantial affirmative public benefits of the transaction outweighed any of the transaction's potential harms.  A thorough review of the Commission's analysis evidences its consideration of the matter comported with the Code and *City of York* and its progeny.  Its determination to grant Aqua a CPC should have been affirmed by the Commonwealth Court, even if the court would have decided differently had it considered the issue in the first instance.

## IV. Conclusion

The holding of the Commonwealth Court is reversed.  As the lower court failed to address the OCA's contention that the Commission's factual findings were not supported by substantial evidence of record, the case is remanded for consideration of that issue.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Brobson and McCaffery join the opinion.